2001 SD 151

**Carol A. PITTS, Petitioner,**

v.

**Vernon L. LARSON in His Capacity as Auditor of the State of South Dakota.**

**No. 22005.**

Supreme Court of South Dakota.

Argued Oct. 1, 2001.

Decided Dec. 26, 2001.

Rehearing Denied Feb. 1, 2002.

Richard J. Helsper of Glover, Helsper & Rasmussen, Brookings, for petitioner.

Mark Barnett, Attorney General, Lawrence E. Long, Chief Deputy Attorney General, Jeffrey P. Hallem, Assistant Attorney General, Pierre, for respondent.

James F. Shekleton, South Dakota Board of Regents, Pierre, for Amicus Curiae.

SABERS, Justice.

[¶ 1.] Carol Pitts, an employee of the South Dakota State University Cooperative Extension Service (SDSU CES) and a member of the South Dakota House of Representatives seeks a Writ of Mandamus compelling Vernon Larson, the State Auditor of South Dakota (Larson or State), to pay her for services rendered during her employment at SDSU. We decline to issue a Writ of Mandamus.

## FACTS

[¶ 2.] On November 7, 2000, Carol Pitts was elected to the South Dakota House of Representatives from District 7, Brookings County. Pitts took the oath of office on January 9, 2001, and served as a representative during the Seventy–Sixth Legislative Assembly of the South Dakota Legislature.

[¶ 3.] During this Legislative session, the 2001 General Appropriation Act was passed by both houses of the Legislature, was signed by the Governor and became law effective July 1, 2001. Some of the appropriations included in the General Appropriation Act were for personal services and operating expenses of SDSU CES.

[¶ 4.] Pitts is currently employed by SDSU CES as a Nutrition, Health and Food Safety Specialist. She has been employed by SDSU CES since March 1990 and is subject to one-year appointment contracts. The most recent one-year appointment contract began July 1, 2001, and runs through June 30, 2002.

[¶ 5.] On February 9, 2001, the Attorney General of South Dakota learned from the media that Pitts was a state employee. The Attorney General advised Pitts that her employment with SDSU CES and her position as a member of the House of Representatives presented a conflict of interest. Pitts, her attorney and the Attorney General's Office entered into discussions on the matter. At the conclusion of the discussions, Pitts was advised that if she continued her employment with the State after July 1, 2001, the date on which the General Appropriation Bill was to take effect, her employment contract would be voided and she would not receive any compensation for her services.

[¶ 6.] In June 2001, Pitts told the Attorney General that she intended to contin-

ue her employment with SDSU CES. On June 25, the Office of the Attorney General informed the State Auditor, Vernon Larson, that Pitts could not be employed by the State. Larson then informed Pitts and SDSU that she would not be paid for any services Pitts performed at SDSU CES after June 30. Pitts requested and received leave without pay from SDSU CES effective on July 1, 2001.

[¶ 7.] The State believes that Pitts' employment with SDSU CES and her service as a member of the House of Representatives violates Article III § 12 of the South Dakota Constitution, which prohibits a legislator from having any interest, direct or indirect, in a contract with the State or county authorized by any law enacted during the legislator's term or one year thereafter. The State argues that Pitts' employment with SDSU CES creates a conflict of interest because funds appropriated by the South Dakota Legislature in the 2001 General Appropriation Act for SDSU CES will be used to pay Pitts under her current appointment contract.

[¶ 8.] Pitts believes that she is entitled to payment for her services at SDSU CES. Pitts argues that she disclosed the nature of her employment with SDSU to the Secretary of State when she began her election process. She claims she was never advised that her candidacy and election would constitute any type of legal conflict with her employment at SDSU.

[¶ 9.] Pitts sought an Alternative Writ of Mandamus which was issued by this Court on July 16, 2001. Pitts asks this Court to direct Larson to pay her for the services she rendered in her capacity as an SDSU employee.

[¶ 10.] **WHETHER PITTS' EMPLOYMENT WITH SOUTH DAKOTA STATE UNIVERSITY WHILE SHE IS A MEMBER OF THE HOUSE OF REPRESENTATIVES OF THE SOUTH DAKOTA LEGISLATURE CONSTITUTES A CONFLICT OF INTEREST IN VIOLATION OF ARTICLE III § 12 OF THE SOUTH DAKOTA CONSTITUTION.**

[¶ 11.] Pitts seeks a Writ of Mandamus to compel Larson to issue a warrant of payment for her employment at SDSU CES. A court may issue a writ "where there is not a plain, speedy, and adequate remedy, in the ordinary course of law." SDCL 21–29–2. The issuance of a Writ of Mandamus is an "extraordinary remedy" that will occur only "when the duty to act is clear." *Baker v. Atkinson*, 2001 SD 49, ¶ 16, 625 N.W.2d 265, 271. This Court has stated that:

Mandamus is a potent, but precise remedy. Its power lies in its expediency; its precision in its narrow application. It commands the fulfillment of an existing legal duty, but creates no duty itself, and acts upon no doubtful or unsettled right. To prevail in seeking a Writ of Mandamus, the petitioner *must have a clear legal right to performance of the specific duty* sought to be compelled and the respondent must have a definite legal obligation to perform that duty.

*Id.* (citations omitted) (emphasis added). Pitts has failed to demonstrate that she has "a clear legal right" to payment for her employment at SDSU CES.

[¶ 12.] Pitts has no clear legal right to payment because her employment with SDSU CES and her position as a member of the South Dakota House of Representatives creates a conflict of interest within the meaning of Article III § 12. Article III § 12 provides:

No member of the Legislature shall, during the term for which he was elected, be appointed or elected to any civil office in the state which shall have been

created, or the emoluments of which shall have been increased during the term for which he was elected, nor shall any member receive any civil appointment from the Governor, the Governor and senate, or from the Legislature during the term for which he shall have been elected, and all such appointments and all votes given for any such members for any such office or appointment shall be void; *nor shall any member of the Legislature during the term for which he shall have been elected, or within one year thereafter, be interested, directly or indirectly, in any contract with the state* or any county thereof, authorized by any law passed during the term for which he shall have been elected.

(emphasis added). This article prohibits "payment of any claims or any part thereof created against the state under any agreement or contract made without express authority of law, and all such unauthorized agreements and contracts shall be null and void." *Norbeck & Nicholson Co. v. State (I)*, 32 S.D. 189, 142 N.W. 847, 851 (1913).

■ [¶ 13.] Pitts argues that the meaning of Article III § 12 is unclear and that it is necessary to look to the intent of the framers.[1] The meaning of this provision, however, is unambiguous. This Court has stated that:

The language of the constitution is plain. Its meaning cannot be mistaken. The purpose of [Article III § 12] is apparent. It is intended to preclude the possibility

of any member deriving, directly or indirectly, any pecuniary benefit from legislation enacted by the legislature of which he is a member. .... It is intended to remove any suspicion which might otherwise attach to the motives of the members who advocate the creation of new offices or the expenditure of public funds.

*Palmer v. State*, 11 S.D. 78, 80–81, 75 N.W. 818, 819 (1898). Therefore, "the language in the constitution must be applied as it reads." *In re Janklow*, 530 N.W.2d 367, 370 (S.D.1995).

■ [¶ 14.] This Court has strictly interpreted the language of Article III § 12. *Asphalt Surfacing Co. v. South Dakota Dep't Transp.*, 385 N.W.2d 115, 117 (S.D. 1986) (holding that a member of the legislature could not be awarded a highway repair contract because he was the president of the company to which the contract was awarded). *See also Palmer*, 11 S.D. 78, 75 N.W. 818 (1898) (holding that a member of the legislature that authorized an appropriation for the railroad commissioners could not be paid for his employment with the railroad commissioners); *Norbeck I*, 32 S.D. 189, 142 N.W. 847 (1913) (holding that a contract between the state board of regents and a corporation is void because a member of the legislature which authorized the contract is also a stockholder in the corporation); *Norbeck & Nicholson Co. v. State (II)*, 33 S.D. 21, 144 N.W. 658 (1913) (same). In *Palmer*, this Court held that Article III § 12 pro-

1. Amicus Curiae Board of Regents also asserts that the meaning of Article III § 12 is unclear and that it is therefore necessary to read this provision in historical context. The Board of Regents argues that the debate in the 1885 Constitutional Convention supports its position that the framers intended that legislators be allowed to engage in non-legislative public service that is not prohibited by Article III § 12. The Board of Regents also

argues that the past appointments of several legislators to the state board of regents is illustrative of its position that legislators are not prohibited from holding state employment. While these facts may be somewhat persuasive historically, unchallenged history does not constitute binding precedent on this Court. Accordingly, we reject these arguments and decline to follow this reasoning.

hibits the state from employing state legislators. 75 N.W. at 819. In *Asphalt Surfacing*, this Court determined that the prohibition contained in Article III § 12 was intended to be broad in scope. 385 N.W.2d at 118. Specifically, this broad prohibition extends to any contract entered into with the State, including the General Appropriation Bill. *Id.* (recognizing language of Article III § 12 applies to "any contract with the state"). When Article III § 12 is violated, the "contract is wholly illegal, void, and against public policy, and cannot be enforced in whole or in part on any theory of any kind." *Norbeck I*, 142 N.W. at 848.

[¶ 15.] Pitts asserts that the facts of *Palmer, Norbeck I & II* and *Asphalt Surfacing* are distinguishable from the case at hand.[2] The facts of these cases, however, are not distinguishable. The 2001 General Appropriation Bill authorized payment for the employees of the SDSU CES. Pitts is a legislator who has an indirect interest in a contract, which was authorized by a law passed during the term for which she was elected. Article III § 12 expressly prohibits direct or indirect interest in any contract authorized by the legislature. "Nothing herein is intended to reflect upon the conduct of [Pitts] as a member of the legislature. . . . The question of [her] good faith is not involved." *Palmer*, 75 N.W. at 819. Pitts has a good reputation as a representative and is well-respected by her fellow legislators.

[T]here was no personal mortal turpitude or dishonesty of any kind involved in this case. . . . We cannot and do not assume but what [Pitts] . . . entered into the contract in question innocently and with the best of motives, but that fact will not make valid or give vitality of any character to a contract declared to be null and void by the laws of this state.

*Norbeck I*, 142 N.W. at 850. Pitts' employment contract with SDSU CES for the 2001–02 year is void and the State properly refused to pay her for this employment. We decline to issue a Writ of Mandamus.[3]

[¶ 16.] KONENKAMP, Justice, concurs.

---

**2.** Pitts asserts that the concurring opinion by Justice Whiting in *Norbeck I* presents the appropriate standard for this Court to follow when construing Article III § 12. Justice Whiting states that "[t]he only contract that a legislator is forbidden to enter into with the state is a contract authorized by a law passed while he was a legislator." *Norbeck I*, 142 N.W. at 853 (Whiting, J., concurring). Pitts argues that Article III § 12 was not adopted because a legislator might use his or her position to obtain an unfair contract, but out of fear that a legislator might be influenced by selfish motives when voting on a bill. Pitts contends that the framers did not intend to prohibit her from participating in the legislature simply because she was an employee of the state. Under these circumstances, we decline to follow the special writing of Justice Whiting.

**3.** The dissent challenges what it perceives to be our "overly broad construction of Article III § 12" and substitutes an *overly narrow* *interpretation* which it bases on an historical travelogue of the "Constitutional debates."

I respectfully submit the dissent should have spent more time on the plain meaning of what the Constitution says rather than what others think it says.

The plain meaning is clear: "nor shall any member of the Legislature during the term . . . or within one year thereafter be interested, *directly* or *indirectly*, in *any* contract with the State. . . ." SD Const. art. III § 12 (emphasis added).

In this context, the Constitution prohibits *any* legislator's *direct* or *indirect* interest in *any* contract with the State. I submit the dissent should avoid historical travelogues and stay at home and read the Constitution for its plain meaning.

The dissent's belief that our interpretation should be guided by the words of one of the drafters rather than by the words used, is, according to Judge Richard Posner, similar to letting dead people take responsibility for their decisions.

[¶ 17.] GORS, Acting Justice, concurs with a writing.

[¶ 18.] GILBERTSON, Chief Justice, files dissenting opinion joined by AMUNDSON, Justice.

GORS, Acting Justice (concurring).

[¶ 19.] Pitts argues that other state employees have served in the legislature in the past. Although this may be true, acquiescence does not make a prior practice constitutional. "A longstanding, widespread practice is not immune from constitutional scrutiny." *Payton v. New York*, 445 U.S. 573, 600, 100 S.Ct. 1371, 1387, 63 L.Ed.2d 639, 659 (1980).

[¶ 20.] Pitts' motives are not in question and the State claims no wrongdoing. However, allowing Pitts to keep her job with South Dakota State University while serving in the legislature would set a dangerous precedent. The state penitentiary could field a candidate for the legislature or hire someone who is already in the legislature. The Mickelson Center for the Neurosciences could climb on the bandwagon with its own candidates. The University of South Dakota and Black Hills State University could each try for a senator or a representative or both. State workers in Pierre and Fort Pierre could elect fellow state employees to the District 24 House and Senate. Granting the writ of mandamus could subject future legislatures to domination by state employees.

[¶ 21.] To her credit, Pitts inquired with her employer, the Board of Regents, and the Secretary of State before running for the legislature. Unfortunately, no one told her that she could not be both a member of the legislature and a state employee. Although this decision is a harsh result in view of her good intentions, as Justice Holmes wrote in *Rock Island RR Co.v. United States*, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188, 189 (1920):

"Men must turn square corners when they deal with the Government."

GILBERTSON, Chief Justice (dissenting).

[¶ 22.] I respectfully dissent. I would grant the writ of mandamus sought by Pitts. I disagree with this Court's overly broad construction of Article III § 12 concerning the prohibitions upon legislators. An examination of the constitutional debates that led to the enactment of Article III § 12 establishes a more limited prohibition.

[¶ 23.] As this Court's opinion notes, through the entire process, Pitts has conducted herself in accordance with what she believed to be compliance with the law. However, the "question of [her] good faith is not involved." *Palmer*, 11 S.D. at 81, 75 N.W. at 819. Likewise, the Attorney General called this potential problem to Pitt's attention as soon as he was made aware of it. All have conducted themselves in a forthright manner reducing this case to solely a question of law, albeit a very important one.

[¶ 24.] Article III § 12 of the Constitution states:

No member of the Legislature shall, during the term for which he was elected, be appointed or elected to any civil office in the state which shall have been created, or the emoluments of which shall have been increased during the term for which he was elected, nor shall any member receive any civil appointment from the Governor, the Governor and senate, or from the Legislature during the term for which he shall have been elected, and all such appointments and all votes given for any such members for any such office or appointment shall be void; nor shall any member of the Legislature during the term for

which he shall have been elected or within one year thereafter, be interested, directly or indirectly, in any contract with the state or any county thereof, authorized by any law passed during the term for which he shall have been elected.

Where the meaning of a constitutional provision is unclear, it is appropriate to look to the intent of the drafting bodies, which in this case were the Constitutional Conventions of 1883, 1885 and 1889.[4] *See Poppen v. Walker*, 520 N.W.2d 238, 242 (S.D. 1994); *Cummings v. Mickelson*, 495 N.W.2d 493, 499 (S.D.1993). Throughout its existence, the Supreme Court of the United States has relied upon the Federalist Papers, authored in large part by delegates to the Constitutional Convention of 1787, as authority for the Court's subsequent constitutional interpretation. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343 n.6, 115 S.Ct. 1511, 1517 n.6, 131 L.Ed.2d 426, 437 n.6 (1995); *Thurlow v. Massachusetts*, 46 U.S. 504, 544, 5 How. 504, 544, 12 L.Ed. 256, 274 (1847).[5] The South Dakota Constitutional Conventions of 1883, 1885 and 1889 provide the same type of authority on a state level.

[¶ 25.] In this instance the meaning of Article III § 12 is not necessarily clear from a reading of the text. For example, in *Norbeck I*, 32 S.D. 189, 142 N.W. 847, the majority of this Court interpreted the prohibitions in the above article in an expansive manner. However, a special concurrence by Presiding Judge Whiting interpreted the provision only to preclude a sitting legislator from voting to create a contract between that legislator and the state or to improve his or her payments under an existing contract which predated the commencement of legislative service. "This constitutional provision was designed to prevent any legislator, while he should be serving the State in the enactment of laws, from being tempted and influenced, either consciously or unconsciously, by any selfish interests." *Id.* (Whiting, P.J., concurring specially).

[¶ 26.] The Constitutional debates provide strong support for the Whiting analysis. During the 1883 Constitutional Convention the following provision was adopted for a proposed Constitution.

No member of the Legislature shall, during the term for which he was elected, be appointed or elected to any civil office in the State, which shall have been created or the emoluments of which shall have been increased, during the term for which he was elected.

*Journal of the Constitutional Convention of 1883*, Vol XXI Department of History Collections of South Dakota 352, 359 (1942). This provision was carried over as a proposal to the 1885 Constitutional Convention in substantially the same form:

No person elected to the Legislature shall receive any civil appointment within this State during the time for which he shall have been elected, and all such appointments, and all votes given for any such members for any such offices or appointment, shall be void.

1885 South Dakota Constitutional Debates 141. Delegate Alphonso G. Kellam[6] of-

---

4. An abbreviated Constitutional Convention was also held in 1887. There was no discussion of the issue now before us. *See* Journal of the Constitutional Convention of 1887, Vol XXI Department of History Collections of South Dakota 471 (1942).

5. *See generally* 1 Julius Gobel, Jr., History of the Supreme Court of the United States: The Framers as Propagandists 292–323 (1971).

6. The comments of Kellam are particularly instructive. Not only was Kellam the author of Article III § 12, he was a delegate to the 1883, 1885 and 1889 Constitutional Conven-

fered an amendment to re-write this clause. "The words which are proposed to be stricken out are altogether too sweeping; it goes entirely beyond the object it was intended to be." *Id.* at 223. Kellam defined the scope of his proposed amendment.

> That section as reported [the original proposal] makes a member of the Legislature absolutely ineligible for any office in the State; it may be one of the offices which has existed in the State for a hundred years, either an appointive or an elective office, in the county, township or the State, for the term for which he was elected. It seems to me that no good purpose can be served the State, or the county of [sic] the township or the municipality, by making a member of the Legislature absolutely ineligible for the office of even township supervisor, for instance, whereas the substitute which I offer is what is provided in nearly all of the constitutions of the different states, *simply making a member of the Legislature ineligible to the office which was created by the Legislature of which he was a member or the pay for which was increased while he was a member.*

*Id.* at 233 (emphasis added). After some further discussion, Kellam described the meaning of his proposal:

> [W]e all understand that the object of that section was simply intended to put the Legislature under such limitation of power that they could not provide themselves with offices. The Legislature is not authorized to make new offices, and could not accommodate each one with an office, and could not create new offices, and entail expenses upon the State for the purpose of accommodating individual members of the Legislature. But the provisions, as reported by the legislative committee, goes [sic] much farther than that. It not only disqualifies members of the Legislature from holding offices created by the Legislature of which they are members, but absolutely disqualifies him [sic] and makes him [sic] ineligible for any office from that of township down. But if there is any reason that the members of that committee, or the Chairman, can give, why these members should be disqualified, and why the disqualification should be so sweeping and broad, I should like the house to be in possession of it.

*Id.* at 226.[7] The Kellam amendment was approved by the Convention. *Id.* The amendment is substantially the text that was to be adopted into the South Dakota Constitution in 1889. *Id.*

[¶ 27.] For years this Court has struggled to ascertain legislative intent in numerous cases where no legislative or constitutional history exists. In this case, however, that is not what happened. We have an instance where the draftsman of a constitutional provision gave a precise explanation of what it meant. No delegate at that constitutional convention contested

---

tions. Oviatt, *South Dakota Justice—the Judges and the System,* 4 (1989). Moreover, Kellam became one of the first three Justices of this Court upon South Dakota obtaining statehood in 1889. *Id.*

7. Delegate Gideon Moody agreed with the Kellam analysis of the Kellam amendment:
   The motion of the gentleman from Brule [Kellam] is the only sensible and correct one. Simply because a man was elected to the Legislature ought not to disqualify him all the time from aspiring to other offices, that have been created after his election. The object of such a law is simply to prevent members of the Legislature from improperly exercising the functions of their office to their own ends, and the amendment offered by the gentleman from Brule accomplishes that object.
   *Id.* at 224.

Kellam's amendment or his explanation of its meaning before it was passed. I cannot accept the proposition that this constitutional debate be dismissed as "[f]irst and foremost, the object of construing a constitution is to give effect to the intent of the framers of the organic law and of the people adopting it." *Poppen*, 520 N.W.2d at 242 (citing *Schomer v. Scott*, 65 S.D. 353, 274 N.W. 556, 559 (1937); *State v. Jorgenson*, 81 S.D. 447, 136 N.W.2d 870, 875 (1965)).

[¶ 28.] Just four years after the enactment of this provision, this Court decided the case of *State ex rel. McGee v. Gardner*, 3 S.D. 553, 54 N.W. 606 (1893). The judicial appointment of Judge Gardner was challenged in part under a claim of a violation of Article III § 12 in that Gardner maintained his seat in the Legislature after he received the judicial appointment. In an opinion written by Judge Kellam, the challenge was found by this Court to be unsuccessful and Gardner retained his judicial seat.

[¶ 29.] *Palmer* is consistent with the Kellam interpretation of Article III § 12. 11 S.D. 78, 75 N.W. 818. Therein, a member of the Legislature was hired to represent the state in court at the same time he sat in the Legislature. This Court held that since the contract was entered into with Palmer during the same legislative session in which he sat, it violated Article III § 12. "[Article III § 12] is intended to remove any suspicion which might otherwise attach to the motives of the members who advocate the creation of new offices or the expenditure of public funds." *Id.* at 819.

[¶ 30.] In *Norbeck I*, this Court struck down a contract between Norbeck's corporation and the state for well-drilling work. 32 S.D. at 196, 142 N.W. at 848. The contract was entered into during the same session as it was authorized by the Legislature and during the session Norbeck was a state legislator. *Id.*

[¶ 31.] This Court today opts to follow *Asphalt Surfacing*, which took the position that even if the legislator did not vote on the appropriations bill, mere membership in the Legislature was sufficient to invoke the prohibitions of Article III § 12. 385 N.W.2d at 118. I find the contemporaneous constitutional debates more persuasive as to the intent of this provision, rather than this Court's *Asphalt Surfacing* decision some 97 years after its adoption. *See Poppen*, 520 N.W.2d at 242; *Cummings*, 495 N.W.2d at 499. In interpreting our Constitution, we should presume it was drafted "with the utmost care and precision in the use of language, and with a full understanding of the accepted meaning of every word used therein." *McCoy v. Handlin*, 35 S.D. 487, 516, 153 N.W. 361, 372 (1915).

[¶ 32.] Moreover, "[t]he object to be sought is the thought of the constitution [sic] makers...." *McGee*, 3 S.D. at 557, 54 N.W. at 607. As previously noted, this reliance upon statements of constitutional draftsmen, as a rule of constitutional construction, has been honored since the days of the founding of the Republic. When courts stray from it, they risk creating new meaning not intended by the framers. As Justice Curtis warned his brethren who headed the judiciary into the now repudiated world of the *Dred Scott* decision:

> When a strict interpretation of the Constitution, according to the fixed rules which govern the interpretation of laws, is abandoned, and the theoretical opinions of individuals are allowed to control its meaning, we have no longer a Constitution; we are under the government of individual men, who for the time being have power to declare what the Constitution is, according to their own views of what it ought to mean.

*Dred Scott v. Sandford,* 60 U.S. 393, 621, 19 How. 393, 621, 15 L.Ed. 691 (1856) (Curtis, J., dissenting).

[¶ 33.] In the words of its maker, the object of Article III § 12 is "to put the Legislature under such limitation of power that they could not provide themselves with offices." 1885 South Dakota Constitutional Debates 226. Herein, Pitts originally contracted with the Board of Regents for her current employment in 1990. She was not elected to the Legislature until 2000. While Pitts did vote for the 2001 appropriations bill, that vote did not create her office or preclude commercial competition for the position.[8] The annual renewal of her employment contract was with the Regents, and was not subject to legislative approval. The Legislature merely funded the contract by its annual appropriations bill.[9]

> A general appropriation bill is not legislation in the true sense of the term. It is as its language implies a setting apart of the funds necessary for the use and maintenance of the various departments of the state government already in existence and functioning. * * * In providing that it should embrace nothing else, the framers of the Constitution undoubtedly intended that members of the legislature [sic] should be free to vote on it knowing that appropriations and nothing else were involved.

*State ex rel. Oster v. Jorgenson,* 81 S.D. 447, 450, 136 N.W.2d 870, 872 (1965) (quoting *Sellers v. Frohmiller,* 42 Ariz. 239, 24 P.2d 666, 669 (1933)). Thus, while appropriations bills may be subject to the restrictions of Article III § 12 under certain circumstances, those circumstances do not exist here. *See Asphalt Surfacing,* 385 N.W.2d at 118.

[¶ 34.] At oral argument, Pitts and the Regents declared that if the state prevails, there would be artificial distinctions which allow municipal and school district employees to serve in the Legislature while precluding state and county employees, and similarly situated retirees, from the same opportunity. The Attorney General countered that if Pitts prevails, this could result in a Balkanization of the Legislature with numerous units of state government running one of their employees to protect their interests. These types of arguments

---

8. I respectfully disagree with the majority as to the precedential value of *Palmer, Norbeck I* and *Asphalt Surfacing* when applied to the facts of this case. All of those cases involved contracts between the state and sitting legislators concerning private commercial interests. Obviously there were other attorneys, well drillers and asphalt contractors who were able to provide those services to the state and did not get to do so. Herein, Pitts is a professional educator in a specialized field. Respondent Larson makes no claim that Pitts' selection to that position 10 years before she entered the Legislature somehow precluded other qualified candidates from filling that position at the subsequent time she was elected to the Legislature and voted on the appropriations bill. As a practical matter, in 2001, there was no open position for which to compete. Pitts was a tenured member of the SDSU faculty.

Moreover, the ink was barely dry on Article III § 12 when, in 1893, Senator Chilcott was appointed to the faculty at SDSU while remaining in the Legislature. Early governmental practices provide "contemporaneous and weighty evidence of the Constitution's meaning." *Alden v. Maine,* 527 U.S. 706, 743–44, 119 S.Ct. 2240, 2261, 144 L.Ed.2d 636, 671 (1999) (citing *Printz v. United States,* 521 U.S. 898, 905, 117 S.Ct. 2365, 2370, 138 L.Ed.2d 914, 925–26 (1997)). Since 1977, Senator Lyndell Peterson, Representative Alice McKay and Senator Mary Wagner have all served in the Legislature while remaining employees of the Board of Regents.

9. Pitts' annual salary is $44,378, which amounts to .0003367% of the budget for the Board of Regents and .000018333% of the State Budget.

are more appropriately dealt with at the policy level by the voters, rather than by this Court. These arguments, while now declared by the contestants to be relevant, were not considered in the enactment of Article III § 12. We have a verbatim record of the policy matters that were considered in 1885 and 1889.

[¶ 35.] Article III § 12 is drawn in the language of 1889, language that today may seem to some to be archaic and incapable of serving the state's current needs. However, as Justice Hugo Black once observed:

> I realize that many good and able [persons] have eloquently spoken and written, sometimes in rhapsodical strains, about the duty of this Court to keep the Constitution in tune with the times. The idea is that the Constitution must be changed from time to time and that this Court is charged with a duty to make those changes. For myself, I must with all deference reject that philosophy. The Constitution makers knew the need for change and provided for it. Amendments suggested by the people's elected representatives can be submitted to the people or their selected agents for ratification. That method of change was good for our Fathers, and being somewhat old-fashioned I must add it is good enough for me.

*Griswold v. Connecticut,* 381 U.S. 479, 522, 85 S.Ct. 1678, 1702, 14 L.Ed.2d 510, 537 (1965) (Black, J., dissenting).[10]

[¶ 36.] For the above reasons, I would hold that Pitts' membership in the 2001 Legislature, and vote on the 2001 appropriations bill did not violate Article III § 12. As such she does have a right to a writ of mandamus. Therefore, I respectfully dissent.

[¶ 37.] AMUNDSON, Justice, joins this dissent.

---

10. An affidavit from the office of the Secretary of State shows numerous attempts at modification of Article III § 12 to be failures. Two attempts to repeal the provision outright were defeated in 1974 (38.4 % to 61.6%) and in 1976 (22.2% to 77.8%). A proposed 1990 Constitutional Amendment to allow competitive bidding by legislators was defeated 35.1% to 64.9%. More recently in 1998, the voters refused to limit the scope of the Article to prohibit only direct legislator contracts with the State (21.4% to 78.6%). The outcomes of these elections, however, do not modify the meaning of the existing constitutional text approved by the drafters and voters in 1889, all of whom were long deceased when these most recent elections were held. One cannot amend the original intent of the drafters and voters of 1889 by citation to vote totals 90 years after that original intent became the constitutional provision we now construe.