2002 SD 131

**Shirleen OLSON–ROTI, Marcia Hohn, Mary Thompson, Gert Hein, Teresa Fonder, Pegge Starr, Verdell Knittel, Sandy Brueske, Sally Weber, Tiffany Tebay, Connie Hjelm And Susie Smith, Plaintiffs and Appellants,**

v.

**Linda KILCOIN, as Personal Representative of Bert Van Dyke and Van Dyke Supply Company and Ferro Corporation, Defendants and Appellees.**

**Nos. 22244, 22245.**

Supreme Court of South Dakota.

Argued Aug. 27, 2002.

Decided Oct. 23, 2002.

Rick Johnson of Johnson, Eklund, Nicholson & Peterson, Gregory, SD, for plaintiffs and appellants.

Susan Brunick Simons of Davenport, Evans, Hurwitz & Smith, Sioux Falls, SD, for defendants and appellees.

SABERS, Justice.

[¶ 1.] Justice RICHARD W. SABERS delivers the majority opinion of the Court on Issue 1, which holds that hearsay statements by the decedent were admissible.

[¶ 2.] Justice SABERS delivers the majority opinion on Issue 2, which holds that Olson–Roti alleged a cause of action in her complaint and may pursue punitive damages.

[¶ 3.] The separate writings of Justice JOHN K. KONENKAMP, joined by Justice ROBERT A. AMUNDSON, and of Chief Justice DAVID GILBERTSON, joined by Justice STEVEN ZINTER, control Issue 3, and hold that a claim for punitive damages does not survive the tortfeasor's death.

[¶ 4.] Justice SABERS dissents on Issue 3.

[¶ 5.] SABERS, Justice, writing the majority opinion on Issues 1 and 2.

[¶ 6.] Shirleen Olson–Roti and 11 others (collectively Olson–Roti) employed by Van Dyke Supply Company filed suit against Company and its owner, Bert Van Dyke, claiming damages for intentional and negligent exposure to dangerous chemicals. Van Dyke died prior to completion of the lawsuit and his daughter, Linda Kilcoin, was named personal representative of his estate and substituted as a defendant (collectively Company). Company now claims 1) on notice of review, that hearsay statements by decedent Van Dyke are inadmissible, 2) that Olson–Roti cannot pursue punitive damages without a separate cause of action, and 3) that a claim for punitive damages does not survive a tortfeasor's death. The trial court granted the motion for summary judgment on Issue 3 and ruled that hearsay statements made by Van Dyke were admissible under SDCL 19–16–34. We affirm all issues through separate opinions.

## FACTS

[¶ 7.] Van Dyke owned Company, located in Woonsocket, South Dakota. Among other products, Company manufactured eyes used by taxidermists. The eyes were made of glass and painted in

two "eye rooms." Company employed approximately 30 women to paint the glass eyes.

[¶ 8.] Company purchased dry paint pigment from Ferro Corporation in Pittsburgh, Pennsylvania, and mixed the dry pigment with other paints to create the paint used on the glass eyes. When delivered, the paint drums were labeled with content descriptions and were accompanied by material safety data sheets. The paints contained both lead and cadmium.[1] After delivery, the paint was either stored in small jars, which were placed on the painting tables for the hand painters, or was attached to an airbrush for the paint sprayers. There were no labels on the jars used by the workers and the labels on the paint drums had been removed.

[¶ 9.] There was a general rule prohibiting eating in the eye rooms, but the rule was not strictly enforced until March 1994, when Van Dyke informed the employees that eating in the eye rooms was not permitted. He later posted signs indicating that eating in the eye rooms was prohibited.

[¶ 10.] In April 1994, Sally Weber, a supervisor in one of the eye rooms, underwent a blood test, which indicated a high level of lead in her blood. Upon learning the results, Weber advised another employee, Shirleen Olson–Roti, to visit her doctor. She also underwent a blood test, which indicated a high level of lead in her blood. Olson–Roti reported the results of her blood test to Van Dyke and he suggested that all of the employees who worked in the eye rooms have their blood tested. Blood testing revealed that 8 women had toxic lead poisoning levels and 12 women had elevated levels.[2] Olson–Roti claims the eye room workers were never informed of the presence of lead and cadmium in the paints they used.

[¶ 11.] In March 1995, Van Dyke sold Company to Cabela's. Olson–Roti filed suit against Van Dyke and Company on February 27, 1996, alleging that Van Dyke and Company intentionally and negligently exposed employees to dangerous chemicals. An amended complaint was filed March 12, 1996 and a second amended complaint was filed February 5, 1997, which added Ferro Corporation as a defendant. Ferro Corporation was later dismissed by stipulation.

[¶ 12.] Company moved for summary judgment on May 4, 1999, arguing that the exclusivity provision under worker's compensation law, SDCL 62–8–6, precluded Olson–Roti's lawsuit. The trial court denied the motion, stating that the exclusivity provision of SDCL 62–8–6 does not prohibit employees from bringing lawsuits for the intentional torts of their employers.

[¶ 13.] The motion for summary judgment was renewed on September 11, 2000. The trial court denied the renewed motion for summary judgment on October 30, 2000.

[¶ 14.] On August 22, 2001, Company filed a motion for summary judgment on the basis that a claim for punitive damages did not survive the death of Van Dyke. Company also challenged the admissibility of hearsay statements made by Van Dyke and presented through the affidavits and

1. Congress has defined lead and cadmium as hazardous chemicals in need of regulation. 15 U.S.C. § 2601. Lead poisoning affects the neurological system, the blood, the kidneys, the gastrointestinal tract and the heart. Cadmium is a known carcinogen.

2. The Environmental Protection Agency considers a lead level of 40 mcg/dL in a person's blood toxic. The Mayo Clinic considers a lead level of 30 mcg/dL in a person's blood to be toxic. (R. at 284). Normal lead levels are 10 mcg/dL or less. (R. at 64).

testimony of two former Company employees, Robert Rieger and Robert Kokesh.

[¶ 15.] The hearsay statements were those of Van Dyke and went directly to his knowledge of the dangers to the women and his refusal to warn them of those dangers. For example, when asked whether the women knew of the danger inherent in their work environment, Van Dyke replied, "[w]hat they don't know won't hurt them." When advised that he should warn the women of the health risks inherent in working with the paint, he asked, "[w]ell, who would I get to paint this if they knew about this?" Kokesh also testified that he heard Van Dyke telling a plant manager that "the stuff would be gone in two weeks" and ordering the manager not to say a "... word about it to anyone else."

[¶ 16.] A hearing was held on December 6, 2001. On January 3, 2002, the trial court granted the motion for summary judgment on punitive damages but determined that the hearsay statements were admissible.

[¶ 17.] Olson–Roti appeals the summary judgment on Issue 3 and Company filed notice of review on Issue 1. For the purposes of brevity and clarity, we address the notice of review first, as Issue 1.

## STANDARD OF REVIEW

[¶ 18.] Our standard of review for summary judgment is well established and is "whether a genuine issue of material fact exists and whether the law was correctly applied." *Manuel v. Wilka*, 2000 SD 61, ¶ 17, 610 N.W.2d 458, 462 (quoting *Parmely v. Hildebrand*, 1999 SD 157, ¶ 7, 603 N.W.2d 713, 715–16 (citations omitted)). Questions of law are reviewed de novo without deference to the trial court. *City of Colton v. Schwebach*, 1997 SD 4, ¶ 8, 557 N.W.2d 769, 771 (citing *Jasper v. Smith*, 540 N.W.2d 399, 401 (S.D.1995)).

[¶ 19.] "[E]videntiary rulings made by the trial court are presumed correct and are reviewed under an abuse of discretion standard." *State v. Perovich*, 2001 SD 96, ¶ 11, 632 N.W.2d 12, 15 (citing *State v. Goodroad*, 1997 SD 46, ¶ 9, 563 N.W.2d 126, 129). "The test is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." *Goodroad*, 1997 SD 46 at ¶ 9, 563 N.W.2d at 129 (citing *State v. Rufener*, 392 N.W.2d 424, 426 (S.D.1986)). While the "ultimate decision to admit or not admit evidence is reviewable under the 'abuse of discretion' standard, the court's preliminary determination of whether the hearsay evidence is reliable will not be overturned unless it is clearly erroneous." *State v. Davi*, 504 N.W.2d 844, 849 (S.D. 1993) (quoting *Matter of R.S.S.*, 474 N.W.2d 743, 749 (S.D.1991)).

[¶ 20.] **1. WHETHER THE TRIAL COURT ERRED IN CONCLUDING THAT VAN DYKE'S STATEMENTS ARE ADMISSIBLE UNDER SDCL 19–16–34.**

[¶ 21.] Robert Rieger, an employee of Company, through an affidavit and live testimony, stated that he had discussions with Van Dyke regarding the exposure of the workers in the eye rooms to lead and cadmium. He stated that when he approached Van Dyke about the missing paint drum labels, Van Dyke told him, "[w]hat they don't know won't hurt them." Robert Kokesh, a maintenance employee at Company, stated in a sworn affidavit, that he was ordered to clean up the eye rooms prior to the arrival of an OSHA inspector. He stated that because of his exposure to the paint, he became ill and learned that he had a high concentration of lead in his system. Kokesh stated that he

heard Van Dyke tell his son-in-law, Bill Kilcoin, that "the stuff would be gone in two weeks and they were not to say a 'word about it' to anyone."

[¶ 22.] Following a hearing regarding the reliability of Rieger and Kokesh's statements, the trial court concluded that the statements were admissible under SDCL 19–16–34. Company argues that the trial court erred in concluding that Van Dyke's statements were admissible through the testimony of Rieger and Kokesh, claiming that the testimony is neither reliable nor corroborated by other evidence.

■ [¶ 23.] SDCL 19–16–34, which addresses the admissibility of a decedent's statements, provides:

> In actions, suits, or proceedings by or against the representatives of deceased persons including proceedings for the probate of wills, *any statement of the deceased, whether oral or written shall not be excluded as hearsay, provided that the trial judge shall first find as a fact that the statement was made by decedent, and that it was in good faith and on decedent's personal knowledge.*

(emphasis added). This Court liberally construes this statute so as to achieve its intended purpose. *Estate of Regennitter*, 1999 SD 26, 589 N.W.2d 920. The admission of a statement under SDCL 19–16–34 is within the trial court's discretion. *Martinson v. Holso*, 424 N.W.2d 664, 667 (S.D. 1988) (citing *In re Congdon's Estate*, 74 S.D. 306, 310, 51 N.W.2d 877, 879 (1952); *Cox v. Bowman*, 71 S.D. 72, 75, 21 N.W.2d 277, 278–79 (1945)).

[¶ 24.] The trial court determined that Van Dyke's statements were admissible. It stated:

> [T]here is corroboration and [ ] we have two people having heard the statement from the decedent[.] [W]e also have the

labels that were torn off the paint cans, and so there is sufficient corroboration to make it admissible.

> Now, the balance of the arguments really go to the weight or credibility of the evidence in the jury's determination should they base their decision on those statements. That's up for the jury ultimately to determine, but the court does rule that they are admissible statements from decedent, and the court would allow the Plaintiffs to present that information.

The trial court determined that the testimony offered by Olson–Roti was based on personal knowledge and good faith affidavits. In addition, the trial court concluded that their testimony was corroborated by the missing labels on the paint cans. Company has failed to show that the trial court was clearly erroneous in determining that the hearsay statements are reliable or that the trial court abused its discretion in concluding that Van Dyke's statements are admissible under SDCL 19–16–34. Therefore, we affirm.

[¶ 25.] **2. WHETHER OLSON–ROTI ALLEGED A SEPARATE CAUSE OF ACTION TO SUPPORT HER CLAIM FOR PUNITIVE DAMAGES.**

■ [¶ 26.] Company argues that South Dakota case law permits punitive damages only when they are supported by a separate cause of action. It argues that Olson–Roti is erroneously claiming that her claim for punitive damages is a separate cause of action, while it is only an element of damages. This point was conceded on oral argument by counsel for Olson–Roti.

■ [¶ 27.] This Court has stated that punitive damages are allowable only when supported by a cause of action. *See Henry v. Henry*, 2000 SD 4, ¶ 5, 604 N.W.2d

285, 288 (quoting *Schaffer v. Edward D. Jones & Co.*, 521 N.W.2d 921, 928 (S.D. 1994) (holding that "punitive damages are not allowed absent an award for compensatory damages")). "If a jury returns a verdict in the plaintiff's favor for zero damages in a case that requires proof of damages as an essential element, then the cause of action has not been proved, and no punitive damages can be awarded." *Henry*, 2000 SD 4 at ¶ 7, 604 N.W.2d at 288, 289 (citing Prosser & Keeton on The Law of Torts § 2 (5th ed.1984)).

[¶ 28.] Olson–Roti alleged 3 causes of action: 1) strict liability in tort, 2) intentional tort, and 3) negligent tort. In count 1 of her complaint, she stated: "[t]hat the operations of the eye paint room using toxic chemicals, organic solvents, lead, cadmium, and heavy materials constituted an abnormally dangerous activity and Defendants are strictly liable therefore." In count 2, she stated that: "Defendants knowingly exposed the Plaintiffs to injurious chemicals, including carcinogens, without warning them and without taking steps to provide proper ventilation, safety devices or testing. That Defendants knew that injuries to the Plaintiffs were substantially certain to result from the exposure to the toxic and carcinogenic substances." In count 3, she alleged that: "[t]he Van Dyke Defendants were negligent in exposing the workers to toxic chemicals, cadmium, organic solvents, lead and heavy metals in the following manner[.]" Therefore, Olson–Roti alleged a cause of action in her complaint and she may pursue a claim for punitive damages.

[¶ 29.] **GILBERTSON, Chief Justice, and KONENKAMP, AMUNDSON, and, ZINTER, Justices, concur.**

[¶ 30.] **The holding of Issue 3, which is that a claim for punitive damages does not survive the tortfeasor's death, is controlled by the writings of Justice KONENKAMP and Chief Justice GILBERTSON.**

### KONENKAMP, Justice.

[¶ 31.] It is not the policy of South Dakota law to punish the next generation for the wrongs of the last. And a dead wrongdoer is far beyond our temporal power to penalize. As the Restatement provides, in survival actions, "the death of the tortfeasor terminates liability for punitive damages." Restatement (Second) of Torts § 926(b) (1979); *see also* Restatement (Second) of Torts § 908 cmt. a (no punitive damages against representative of deceased tortfeasor in a death action).

[¶ 32.] Punitive damages in South Dakota are not designed to compensate victims. As Prosser explains, "it is generally agreed that punitive damages are a windfall to the plaintiff and not a matter of right[.]" Prosser and Keeton on Torts § 3, 14 (5th ed. 1984); *cf. Mongold v. Estate of Gilbert*, 114 Ohio Misc.2d 32, 758 N.E.2d 1245, 1247 (Ct.Comm.Pl.2000) (punitive damages not awarded as additional compensation but to punish and deter conduct).

[¶ 33.] The punitive and deterrent aims of exemplary damages are inseparable. Our Legislature has spoken clearly on this point: a jury "may give damages for the sake of example, *and* by way of punishing the defendant." SDCL 21–3–2 (emphasis added). Therefore, both punishment of the tortfeasor and deterrence are required to satisfy the statutory punitive damage provision. As one California appeals court held in interpreting a similar provision, "[s]ince the purpose of punitive damages is to punish the wrongdoer for his acts ... and to deter him from the commission of like wrongs in the future, the reason for such damages ceases to exist with his death." *Whelan v. Rallo*, 52

Cal.App.4th 989, 60 Cal.Rptr.2d 876, 877 (1997). Assessing punitive damages against an estate serves to neither punish nor deter the tortfeasor.

[¶ 34.] Concededly, the acts alleged against the decedent in this case describe reprehensible conduct. But we cannot ignore the clear language in our punitive damage statute declaring the purpose for punitive damages: to deter and punish wrongdoers, not their heirs.

[¶ 35.] Therefore, we affirm on Issue 3.

[¶ 36.] **AMUNDSON, Retired Justice, concurs.**

[¶ 37.] **GILBERTSON, Chief Justice, and ZINTER, Justice, concur in result.**

[¶ 38.] **SABERS, Justice, dissents.**

**GILBERTSON, Chief Justice (concurring in the result).**

[¶ 39.] While Olson–Roti mounts an impressive argument based on equitable public policy, this is not an equitable issue. Rather, the statutory interpretation of our punitive damage statute alone controls the resolution of this issue. In this jurisdiction, punitive damages have not been recoverable at common law, but rather, only where specifically authorized by statute. *Vilhauer v. Horsemen's Sports, Inc.,* 1999 SD 93, ¶¶ 19–20, 598 N.W.2d 525, 529–30; *Thu v. American Family Ins. Co.,* 292 N.W.2d 109, 110–11 (S.D.1980). SDCL 21–3–2 states:

In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful and

wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, *may give damages for the sake of example, and by way of punishing the defendant.* (emphasis added).

The content of this statute has remained virtually unchanged since its enactment by the Dakota Territorial Legislature in 1877.[3] *Schaffer v. Edward D. Jones & Co.,* 1996 SD 94, ¶ 22, 552 N.W.2d 801, 809, n. 6.

[¶ 40.] At virtually the same time, the Supreme Court of Iowa was asked to decide the very question that is now before us. In *Sheik v. Hobson,* 64 Iowa 146, 19 N.W. 875 (Iowa 1884), the court held that a claim of slander against a decedent defendant survived his demise and compensatory damages could be awarded against his estate. However, the court noted that claims for punitive damages uniformly died with the decedent.

But [plaintiff] had no personal interest in the question of [defendant's] punishment. So far as [defendant] was concerned, the punitory powers of the law ceased when he died. To allow exemplary damages now, would be to punish his legal and personal representatives for his wrongful act; but the civil law never inflicts vicarious punishment.

19 N.W. at 875–76. *See also Rowen v. Le Mars Mut. Ins. Co. of Iowa,* 282 N.W.2d 639, 661 (Iowa 1979); *Wolder v. Rahm,* 249 N.W.2d 630, 632 (Iowa 1977).

[¶ 41.] The pertinent language of SDCL 21–3–2 appears to be the same as California in that it is allowed punitive damages "in addition to the actual damages," and "for the sake of example and by way of punishing the defendant." *Evans v. Gibson,* 220 Cal. 476, 489, 31 P.2d 389,

---

**3.** Originally SDCL 21–3–2 constituted two separate statutes. *See* 1877 Civ.Code § 1946 and § 1974. However, the relevant language

which we are now called upon to interpret remained intact through the combination of these two statutes in 1939. *See* SDC 37.1902.

395 (Cal 1934). At the time of the *Evans* decision, that court's research indicated that no case could be located which authorized a claim for punitive damages to survive the defendant's death and be pursued against the decedent's estate. 220 Cal. at 490, 31 P.2d at 395.[4] *See also* 25 C.J.S. *Damages* 125(3).

[¶ 42.] Although somewhat more recent, the Supreme Court of Minnesota arrived at the same result based on its conclusion that the statutory intent of the punitive damage statute was for punishment of the tortfeasor and future deterrence of similar acts by the tortfeasor. The court concluded that neither purpose applied to a decedent. *See Thompson v. Petroff's Estate*, 319 N.W.2d 400, 408 (Minn.1982). The Court further found as "not persuasive" the plaintiff's claim that the allowance of punitive damages would serve as a deterrent to third parties. *Id.*

[¶ 43.] Fundamentally, I disagree with the public policy method of analysis for a resolution of this issue. It is not an examination of the majority vs. minority positions and a determination of which is most "persuasive." In this case, it is solely a question of statutory interpretation and what the Legislature in 1877 intended when it enacted the predecessors to SDCL 21–3–2. The reliance on cases to the contrary which were decided for the most part a 100 years or more after the enactment of SDCL 21–3–2, provide no basis for a "judicial amendment" to the clear meaning of the statute. The weighing of the public policy benefits of one view as against the other is the prerogative of the Legislature, not this Court in the clear absence of a legislative directive for us to do so.

[¶ 44.] The statute in dispute is drawn in the public policy and language of 1877. It may today seem to some to be archaic and incapable of serving the state's current public policy goals. However, as Justice Hugo Black once observed concerning the related issue of constitutional interpretation:

> I realize that many good and able [persons] have eloquently spoken and written, sometimes in rhapsodical strains, about the duty of this Court to keep the Constitution in tune with the times. The idea is that the Constitution must be changed from time to time and that this Court is charged with a duty to make those changes. For myself, I must with all deference reject that philosophy. The Constitution makers knew the need for change and provided for it. Amendments suggested by the people's elected representatives can be submitted to the people or their selected agents for ratification. That method of change was good for our Fathers, and being somewhat old-fashioned I must add it is good enough for me.

*Pitts v. Larson*, 2001 SD 151, ¶ 35, 638 N.W.2d 254, 264 (Gilbertson, J., dissenting) (citing *Griswold v. Connecticut*, 381 U.S. 479, 522, 85 S.Ct. 1678, 1702, 14 L.Ed.2d 510, 537 (1965) (Black, J., dissenting)).

[¶ 45.] Thus, claims for punitive damages under our statute do not survive the tortfeasor's death and cannot be enforced against the tortfeasor's estate or heirs.

[¶ 46.] **ZINTER, Justice, concurs.**

**SABERS, Justice (dissenting).**

[¶ 47.] **I dissent on Issue 3 for all of the following reasons because the estate**

---

4. The *Evans* interpretation of statutory language of § 3294 of the California Civil Code, which is the same as SDCL 21–3–2, is particularly persuasive as the source notes of SDCL 21–3–2 and the preface to the 1877 Dakota Territorial Code indicate it was based upon that California statute. 1877 Dak. Terr.Code page V of the preface. *See also Trouten v. Heritage Mut. Ins. Co.*, 2001 SD 106, ¶ 31, 632 N.W.2d 856, 863, n. 3.

of a tortfeasor should be subjected to liability for punitive damages to the extent of the estate's ill-gotten gains.

[¶ 48.] South Dakota's survival statute, SDCL 15-4-1, provides:

*All causes of action shall survive* and be brought, notwithstanding the death of the person entitled or liable to the same. Any such action may be brought by or against the executor or administrator or successors in interest of the deceased.

(emphasis added).

[¶ 49.] Our holding on Issue 2 purports to allow recovery of punitive damages against the estate of a deceased tortfeasor in the circumstances of this case. However, Company argues that punitive damages are not recoverable against the estate of a deceased tortfeasor because the dual purposes of the punitive damages statute, punishment and deterrence, are not satisfied. Specifically, it argues that since Van Dyke is deceased he cannot be "punished" in accord with South Dakota's statute allowing for punitive damages.[5] This assertion should fail in light of the fact that an obvious desire of human nature is to leave a legacy to one's heirs. A person is punished, through his estate, when his estate is diminished to the extent of his ill-gotten wealth. Furthermore, the objectives of punishment and deterrence are achieved by imposition of punitive damages against the estate of a wrongdoer. Allowing for the recovery in these circumstances would punish Van Dyke through his estate and deter others from similar wrongdoing in the future.

[¶ 50.] This rule would

send[ ] a forceful message that a person's assets may not be insulated by the happenstance of death. Although ordinarily earmarked for the decedent's heirs, such assets may be required to satisfy both compensatory and punitive damage awards flowing from his or her wrongdoing. We see nothing unjust in this principle.

*Haralson v. Fisher Surveying, Inc.*, 201 Ariz. 1, 31 P.3d 114, 118–19 (2001). Clearly, to permit the wrongdoer's estate to escape liability on the basis of his death would create a windfall to the heirs and in effect punish the victims.

[¶ 51.] I recognize that a majority of jurisdictions who have considered this issue do not permit an award of punitive damages against a tortfeasor's estate. I have no quarrel at this time with the majority rule insofar as it deals with a tortfeasor's actions in a non-economic situation. For example, a DUI tortfeasor whose negligence results in death to himself and others obviously causes adverse consequences to his family or heirs and they seldom profit from his wrong. In fact, the family and heirs are damaged by that tortfeasor's actions.

[¶ 52.] Company asserts that imposition of punitive damages against the tortfeasor's estate would result in injury to the innocent heirs. However, here, in an economic situation, Van Dyke, Company, and his estate clearly profited from his wrongful actions and his heirs have no lawful or justifiable claim to his ill-gotten gains. Moreover, a beneficiary's rights are always subject to the lawful debts of and claims against the estate. In the instant case, the heirs to Van Dyke's estate would not be damaged or injured but would simply be denied the profits the estate received through the wrongful behavior of the dece-

---

**5.** SDCL 21-3-2 provides: "In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or pre- sumed ... the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant."

dent. In other words, the heirs would be denied only those profits the estate would not have had but for Van Dyke's tortious behavior at the expense of the victims.

[¶ 53.] These facts should lead us to find the reasoning of the minority more persuasive.

> *There is no logical reason why courts should allow a punitive damage award against a defendant who survives a judgment, but deny it where death occurs earlier.* Suppose, for example, two individuals commit equally culpable and outrageous acts. One is comatose and, for all practical purposes, has no reasonable chance of recovery. The other is dead. Is there a way to explain why the unconscious tortfeasor would have his assets exposed to punitive liability, while the deceased's estate would be immunized from it? Surely the answer does not lie in our inability to punish the wrongdoer.
>
> . . . .
>
> Because punitive damages can serve as both an example and a deterrent to others in the community, we hold that there is no per se prohibition against their imposition upon a decedent's estate. Such an award is peculiarly within the province of the trier of fact. . . . . The jury should also be reminded of its right to decline a punitive verdict altogether. Moreover, the parties are free to argue the reasonableness and advisability of such an award. Thus, *an estate is placed in the same position as any other defendant against whom a punitive award is sought.*

*Haralson,* 31 P.3d at 118–19 (emphasis added). *See also Ellis v. Zuck,* 546 F.2d 643, 644–45 (5thCir.1977) (holding that punitive damages may be assessed against the estate of a deceased tortfeasor); *Tillett v. Lippert,* 275 Mont. 1, 909 P.2d 1158, 1162 (1996) (holding that punitive damages

may be assessed against a tortfeasor's estate for "sake of example"); *Hofer v. Lavender,* 679 S.W.2d 470, 474–75 (Tex.1984) (holding that punitive damages may be assessed against a tortfeasor's estate for purposes of deterrence, inconvenience, public good and other losses); *Shirley v. Shirley,* 261 Ala. 100, 73 So.2d 77, 85 (1954) (stating that state wrongful death statute is interpreted to permit punitive damage awards on a general deterrence theory).

[¶ 54.] I recognize the importance of avoiding windfalls even when the victims are innocent, as in this case. Therefore, I would hold that those wrongfully injured in an economic situation may recover from the estate of the wrongdoer only to the extent they can prove that the estate profited from the wrong by a preponderance of the evidence.

[¶ 55.] This rule is based on sound public policy. First, it is a fundamental common law principle that no person should be entitled to profit from his or her own wrong. *Bosse v. Quam,* 537 N.W.2d 8, 14 (S.D.1995) (Sabers, J., dissenting); *Dacy v. Gors,* 471 N.W.2d 576, 582 (S.D.1991) (Sabers, J., dissenting). Second, no person should receive a windfall at the expense of those wrongfully injured. This is in accord with the general principle that "equity will not tolerate unjust enrichment." *Parker v. Western Dakota Insurors, Inc.,* 2000 SD 14, ¶ 31, 605 N.W.2d 181, 193 (Gilbertson, C.J., dissenting) (citing *People ex rel. Palmer v. Peoria Life Ins. Co.,* 376 Ill. 517, 34 N.E.2d 829, 834 (1941)). To the extent an estate profits from the wrongful activity of a decedent, there is a direct windfall to the heirs at the expense of those who are injured. Neither fairness nor equity should permit such a result.

[¶ 56.] Accordingly, I would reverse the trial court's grant of summary judg-

ment and remand this issue for proceedings consistent with this dissent.