WOLF, Appellant, v. WOLF, et al, Respondents.

(240 N. W. 349.)

(File No. 7095. Opinion filed January 25, 1932.)

*Cherry, Davenport & Braithwaite,* of Sioux Falls, for Appellant.

*Boyce, Warren & Fairbank,* of Sioux Falls, for Respondents.

MISER, C. James Wolf, now deceased, was the father of plaintiff and appellant, Charles Wolf, by a first marriage, and of defendants and respondents, Joseph Wolf and Mable Eddy, by a second marriage. On September 10, 1917, he signed and acknowledged a warranty deed of the property in which he lived, naming respondents as grantees. Appellant brought suit claiming that there was neither the form nor substance of a delivery of that deed, and asking that it be declared void.

On the question of delivery, the trial court found that the deed was prepared at the request of the grantor; was by him, on September 10, 1917, physically delivered to Joseph for himself and his cograntee; that it was the intention of the grantor at that time to transfer the title to the grantees; that Joseph kept the deed in his possession until the same was produced by him upon the trial of this action; that he filed the deed for record during the lifetime of the grantor, and that at the time of said delivery it was understood between the grantees and the grantor that the grantor should continue to occupy the premises until his death.

Some of the evidence supporting these findings is as follows: The regiment in which Joseph enlisted on May 10, 1917, was mo-

bilized at Sioux Falls on July 15, 1917. His mother, the second wife of James, died on July 29, 1917. During the year preceding her death James had on occasions told her of his intention to give the property in question to respondents. Immediately after his wife's death, and again two weeks later, he told another witness of that intention. Joseph's regiment left Sioux Falls on September 15, 1917. On September 10, when told of Joseph's prospective departure, James went to the real estate office of one Norton, accompanied by Joseph, where Norton drew the deed at James' request. It was signed by James and by him acknowledged before Norton. Norton told James to hand the deed to Joseph. To Joseph's inquiry as to why this was done, Norton replied: "That makes it legal." Joseph received the deed from James and then put it with his own, Joseph's, papers in a lock box in Norton's office. This box had been rented by James, but both James and Joseph had keys to the box and each kept his own papers in it, separated by means of a rubber band. When Joseph left with his regiment, he handed his key to his father. In the spring of 1919 he obtained his key from his father to put his discharge from the Army in the box. When he returned from so doing, James asked if his, Joseph's deed was there. In 1924, Joseph rented a box from another bank and placed his papers, including the deed, in it. James asked him to place his papers with Joseph's, saying: "They are now yours." On September 10, 1917, nothing was said by James with reference to recording the deed, but prior to his wife's death he had said: "I will make out a deed to you and Mable for the property, and you don't need to record it until something happens to me." Joseph's understanding, however, was that the property was his, Joseph's when James gave him the deed. He did have it recorded in 1927 in order to borrow money with which to pay the expenses of his father's extended illness, and the expense of taking him to the Soldiers' Home.

James continued to live on the premises until in 1919, when the house burned, Mable keeping house for him. In 1920, the house having been rebuilt, the three moved back to it. Mable remained with her father as his housekeeper until 1926. During that time James told her many times that Joseph had the deed, and that she would get her share when anything happened to him, James.

From 1917 until the death of James in 1928, the taxes were

paid in semiannual installments ordinarily by the pension warrant of James plus cash added by Joseph or Mable. After his return from the Army, Joseph spent $165 of his own money to have a well dug on the place. After James left the place in 1926, Joseph expended for insurance, taxes, and improvements on the property about $2,700 during which time he received from rents and his father's pension about $2,400. While Joseph was in the Army, his father inquired by letter whether he desired to trade the property, to which Joseph answered in the negative.

There are some contradictions to the foregoing testimony. Even so, the findings of fact of the trial judge are amply supported by the evidence. A grant takes effect so as to vest the interest intended to be transferred only upon its delivery by the grantor. Section 524, R. C. 1919. While the burden of proving delivery rests upon the party who claims that it was delivered (Thompson on Real Property, § 3866) possession of the deed by the grantee, unexplained, raises the presumption of a delivery to him by the grantor. Thompson on Real Property, § 3886. It follows that he who disputes this presumption has the burden of proving no delivery. Devlin on Real Estate (3rd Ed.) § 294, quoting Tunison v. Chamblin, 88 Ill. 379, 387, as follows:

"When a deed, duly executed, is found in the hands of a grantee, there is a strong implication that it has been delivered, and only clear and convincing evidence can overcome the presumption. Otherwise, titles could be easily defeated, and no one could be regarded as being secure in the ownership of land."

On the foregoing authorities and on facts less favorable to the grantee than the facts in the case at bar, the Supreme Court of California in Stewart v. Silva, 192 Cal. 405, 221 P. 191, held that the presumption of delivery arising from the possession of the deed and its presentation in court was not overcome. In Webb v. Webb, 130 Iowa 457, 104 N. W. 438, it was held that, where deeds are duly signed, acknowledged, and recorded, it is presumed that they were properly delivered; that the delivery to one of several grantees is delivery to all; and the fact that the grantor remained in possession of the property until her death is not controlling on the question of delivery, where she had parted absolutely with all control over the instrument.

In support of his contention that even though accepting respondents' version of the transaction, there was a delivery in form, yet there was not any delivery in substance of the deed, appellant cites Koester v. Port Huron Co., 24 S. D. 546, 124 N. W. 740; Cassidy et al v. Holland, 27 S. D. 287, 130 N. W. 771; Gordon v. White, 33 S. D. 234, 145 N. W. 439; Churchill & Alden Co. v. Ramsey, 48 S. D. 237, 203 N. W. 502. The case of Koester v. Port Huron Co., supra, quotes and follows Kenney v. Parks, 125 Cal. 146, 57 P. 772; Cassidy et al v. Holland, supra, quotes with approval Porter v. Woodhouse, 59 Conn. 568, 22 A. 299, 13 L. R. A. 64, 21 Am. St. Rep. 131. The facts of all the South Dakota cases above cited, as well as the facts in Kenney v. Parks, supra, and Porter v. Woodhouse, supra, are very unlike the facts upon which the trial court, in the case at bar, held there was a delivery. Appellant also cites a large number of other cases from other jurisdictions, which it would serve no useful purpose to list herein, inasmuch as they are merely cumulative in supporting a statement of law with which respondents themselves agree. As a case in which the facts are on all fours with the facts in the case at bar, appellant cites Weigand v. Rutschke et al, 253 Ill. 260, 97 N. E. 641, 642. There was some similarity in the facts, but some of the dissimilarities are shown in the following quotation therefrom:

"Though the grantee occupied the property as soon as it was ready for occupancy, she did so not claiming under the deed, but as the tenant of her mother, to whom she paid rent, and the latter paid the taxes, repaired the property at her own expense, and kept it insured in her own name. The deed itself was in the hands of the grantee for only a few minutes, and was immediately handed back to the grantor, who did not wish it to be recorded, and it remained in her possession and under her dominion and control until her death."

Appellant cites no authority which would permit this court, on the facts, as proven and as found, to order a reversal of the judgment appealed from. It must therefore be, and it is affirmed.

CAMPBELL, P. J., and POLLEY, ROBERTS, WARREN, and RUDOLPH, JJ., concur.