2004 SD 42

**CONVENIENCE CENTER, INC.,
Plaintiff and Appellee,**

v.

**David COLE d/b/a Cole Petroleum Co.
and Cole's Petroleum Products, Inc., a
South Dakota corporation, Defen-
dants and Appellants.**

Nos. 22861, 22875.

Supreme Court of South Dakota.

Considered on Briefs Feb. 17, 2004.

Decided March 31, 2004.

Thomas K. Wilka of Hagen, Wilka &
Archer, Rapid City, South Dakota, Attor-
neys for plaintiff and appellee.

James C. Roby of Green, Schulz, Roby, Oviatt, Cummings & Linngren, Watertown, South Dakota, Attorneys for defendants and appellants.

KONENKAMP, Justice.

[¶ 1.] Convenience Center, Inc. (CCI) brought a declaratory action requesting the circuit court to rule that Cole's Petroleum Co. had breached a petroleum product delivery agreement between the parties when it charged CCI an unreasonable and unfair price for the products. After discovery, CCI amended its complaint to allege that Charlotte Cole had held all rights under the delivery agreement and that she had effectively released CCI from any obligations under the agreement. The circuit court ruled that (1) the prices charged were fair and reasonable, (2) Charlotte, not Cole's Petroleum, was the assignee of the rights under the agreement, and (3) Charlotte had released CCI from the agreement. Because we find no error in the court's interpretation of the agreement and because the court was not clearly erroneous in its factual determinations, we affirm.

## Background

[¶ 2.] Thomas Cole and Charlotte Cole, husband and wife, entered into an "Option to Purchase Real Estate" with Venerts Investments, Inc. The option gave Venerts the right to purchase real estate in Codington County, South Dakota. It provided:

The conveyance to be made will be subject to the provisions that Thomas E. Cole or his heirs and assigns shall have the exclusive right to sell the petroleum products for twenty (20) years to any retail outlot [sic] that sells petroleum products that maybe [sic] located on said property. The cost of said products sold to said retail outlot [sic] shall be at a fair and reasonable cost, and not to exceed

the cost that the supplier sells similar products to any other outlot [sic] in Watertown.

Venerts exercised the purchase option and the deal was closed on July 1, 1992. Eventually, title to the property passed to CCI. Owing to an error, the deed conveying the property from Thomas and Charlotte to Venerts did not contain a reference to the twenty-year petroleum sale agreement mentioned in the option. Consequently, CCI's title also failed to set forth the option language.

[¶ 3.] William Folkerts and James Berven, principals in Venerts, were the promoters and developers of several corporations including CCI. CCI planned to develop a Pump 'N Pak convenience center on a portion of the conveyed property. Among the investors in CCI were Thomas and Charlotte Cole, and Joan and Judd Cole. Many of the CCI investors, including Thomas, Charlotte, Joan, and Judd, also invested in the other corporations developed by Folkerts and Berven.

[¶ 4.] To correct the earlier omission of the petroleum delivery agreement, Thomas and Charlotte asked CCI to execute an agreement identical to the one in the original option. On January 29, 1993, CCI executed an identical agreement, except that it was limited to the parcel of land owned by CCI. That agreement gave Thomas, his heirs, and assigns

the exclusive right to sell petroleum products for twenty years to any retail outlet that sells petroleum products that maybe [sic] located on said property. The cost of said products sold to said retail outlot [sic] shall be at a fair and reasonable cost, and not to exceed the cost that the supplier sells similar products to any other outlot [sic] in Watertown.

The agreement referred to Thomas as the licensee. It was then properly recorded.

[¶ 5.] From 1992 until his death in 1997, Judd ran Cole's Petroleum Products, Inc. Thomas, Judd's brother, worked for the company until his death in 1994.[1] On Thomas's death, Charlotte, his widow, became heir to the delivery agreement. When Judd died, David Cole, Judd's son, and Joan, Judd's widow, became the sole shareholders in Cole's Petroleum. Charlotte held no interest in the company.

[¶ 6.] Beginning with the opening of CCI in 1992, Cole's Petroleum supplied all CCI's petroleum requirements. Cole's Petroleum generally charged CCI $0.025 over the "rack" price for the fuel it delivered.[2] This markup did not exceed the cost of petroleum sold by Cole's Petroleum to other Watertown outlets. Through the years 1999 to 2002, accounting errors resulted in a net overcharge by Cole's Petroleum to CCI of $5,062.55.

[¶ 7.] Eventually, the Venert business ventures began to experience financial difficulty, resulting in cash calls. Some of the investors became dissatisfied with the management. By December 6, 1997, at a Board of Directors meeting of CCI, a workout plan was discussed that would ultimately result in some of the shareholders redeeming their stock in exchange for certain accommodations made by the corporation. As part of Charlotte's buyback agreement, she was to "release [CCI] of the Cole covenant ... to remove cloud on title[.]" On December 3, 1998, Charlotte released "any and all claim of whatever nature" against CCI, Venerts, and others. On February 7, 2000, Charlotte surrendered to the corporation her stock and signed a "Mutual Release of All Claims."

[¶ 8.] Despite the releases, Cole's Petroleum continued to exclusively supply CCI with petroleum products. Concerned that they were not being charged a fair and reasonable mark-up, however, Berven and Folkerts scheduled a meeting with David. They were unable to resolve the dispute.

[¶ 9.] Believing that David had succeeded to the agreement between Thomas and CCI, CCI brought an action against Cole's Petroleum praying for a declaratory judgment canceling the agreement between the parties and for damages for the unfair and unreasonable charges billed by Cole's Petroleum. Later, CCI amended its complaint alleging that Cole's Petroleum was not an assignee of the delivery agreement, that the agreement was not a covenant running with the land, and that Charlotte, the true party succeeding to the agreement, had earlier released CCI.

[¶ 10.] After a trial, the circuit court concluded that (1) the delivery agreement between Thomas and CCI was not a covenant running with the land, (2) the agreement was not a license, (3) Charlotte, not Cole's Petroleum, was the successor in interest to the rights of Thomas, (4) the price charged by Cole's Petroleum to CCI was fair and reasonable,[3] and (5) Charlotte had effectively terminated the agreement when she signed the mutual release. On appeal, Cole's Petroleum questions "Whether the January 29, 1993 Agreement between [CCI], as licensor, and Thomas E. Cole, his heirs and assigns, as licensee, is a contractual obligation binding [CCI], and its successors-in-interest to purchase pe-

---

1. Thomas Cole was neither an owner nor an officer of Cole's Petroleum.

2. "Rack" price is the price Cole's Petroleum paid its supplier at the terminal.

3. The trial court awarded CCI $5,062.55, the amount of overcharges caused by accounting errors.

troleum products from Cole's Petroleum for a 20–year term?" For its part, CCI requests that this Court overturn the trial court's conclusion that the prices charged by Cole's Petroleum were fair and reasonable and requests that damages be recalculated.

## Analysis and Decision

[¶ 11.] Our standard of review is guided by SDCL 15–6–52(a). Under that statute, we reverse a trial court's findings of fact only when we find clear error. *Id.* This remains true whether the finding was based on oral or documentary evidence. *Id.* A trial court's findings of fact are clearly erroneous only if, after review, we are left with a firm and definite conviction that a mistake was made. *Wiedmann v. Merillat Indus.*, 2001 SD 23, ¶ 10, 623 N.W.2d 43, 47. However, when an issue presents a question of law, such as contract interpretation, our standard of review is de novo. *Roden v. Gen. Cas. Co. of Wisconsin*, 2003 SD 130, ¶ 6, 671 N.W.2d 622, 625 (citations omitted).

[¶ 12.] Although Cole's Petroleum frames its issue as hinging on whether the delivery agreement was a license or some other conveyance, we need not address that question unless we conclude that the trial court was clearly erroneous in ruling that (1) Charlotte, not Cole's Petroleum, was the successor-in-interest to Thomas's rights and (2) Charlotte released her right to enforce the CCI agreement when she signed the mutual release. If those rulings were correct, it is irrelevant what type of conveyance CCI and Thomas intended.

[¶ 13.] We begin by addressing the argument that Cole's Petroleum, not Charlotte, held the rights to the delivery agreement with CCI. In support of this contention, Cole's Petroleum argues that "[u]p until nine days before the trial of this dispute, it had not dawned on CCI to claim that Cole's Petroleum was not the successor-in-interest to Thomas E. Cole." Cole's Petroleum also notes that "[a]ll petroleum sales during the history of the relationship with CCI, were made by [Cole's Petroleum]."

[¶ 14.] CCI's mistaken belief that Cole's Petroleum, not Charlotte, was the successor-in-interest to Thomas Cole's Petroleum rights is not dispositive. Under the agreement, Thomas had the right to exclusively supply any petroleum retail outlet on the property with petroleum products. It was his prerogative to choose to supply petroleum products to CCI through Cole's Petroleum. Per the agreement, CCI was bound to accept the chosen supplier. However, had Thomas chosen some other supplier, the plain language of the agreement allowed him to do so. While Thomas may have had in mind at the time of the agreement that Cole's Petroleum would be the only supplier of petroleum products, that is not what he negotiated for and received. He negotiated for and received a right for himself, not Cole's Petroleum. On Thomas's death, he passed his rights to Charlotte.[4] Charlotte continued to supply CCI through Cole's Petroleum. However, she too could have chosen a different supplier. While CCI may have mistakenly believed it was contractually bound through an agreement with Cole's Petroleum, it was not. Instead, CCI was obligated to purchase petroleum products from any supplier designated by Thomas and later Charlotte.

[¶ 15.] Cole's Petroleum also argues that "CCI's dealings and course of conduct and performance confirmed that Cole's Pe-

---

4. The fact that Thomas included in his will his rights in the agreement clearly demonstrates that he thought he had not assigned his rights to Cole's.

troleum held the supply rights." It points to the fact that it has been the sole supplier for CCI and that CCI attempted to renegotiate the agreement directly with Cole's Petroleum, not Charlotte. Although under these arrangements Charlotte's acquiescence to Cole's Petroleum representation might be classified as an implied agency, alone, it does not reassign the parties to the agreement. In sum, we are not definitely and firmly convinced that the trial court erred in finding that Charlotte was the successor-in-interest to Thomas's rights. The plain language of the contract supports the trial court's conclusion.

[¶ 16.] Next then, we must determine whether Charlotte released CCI from its obligation when she signed the mutual release. Cole's Petroleum argues that before signing the mutual release Charlotte "acknowledged that the right to supply petroleum to CCI was held by Cole's Petroleum." However, Cole's Petroleum does not cite to any portion of the record to support this assertion. As such, we cannot say that the trial court was clearly erroneous in finding that she did not. Finally, Cole's Petroleum contends in its reply brief that Cole's Petroleum and CCI never reached a "firm agreement" which would release CCI from its obligation to purchase petroleum products from Cole's Petroleum. However, there was no need for CCI to reach an agreement with Cole's Petroleum because Charlotte was the successor-in-interest.

[¶ 17.] Having concluded that the trial court was not clearly erroneous in determining that Charlotte, as successor-in-interest to Thomas, released CCI of its obligation under the agreement, it is unnecessary to resolve what type of agreement was terminated. Therefore, we move to CCI's claim that the trial court clearly erred in finding that Cole's Petroleum did not unreasonably and unfairly charge CCI for the products it sold under the agreement.

[¶ 18.] Pertinent to this issue, the agreement between Thomas and CCI provided that "[t]he cost of said products sold to said retail outlot [sic] shall be at *fair and reasonable cost*, and not to exceed the cost that the supplier sells similar products to any other outlot [sic] in Watertown." (Emphasis added.) CCI does not dispute the trial court's finding that the charges to CCI did not exceed what Cole's Petroleum charged other Watertown outlets. Instead, CCI claims clear error in the finding that the $0.025 markup was "fair and reasonable."

[¶ 19.] The trial court found this markup fair and reasonable based on expert testimony and the inclusion of freight delivery. CCI's analysis turns on its assertion that "fair and reasonable" costs must be based on "market rate." Citing *Fed. Land Bank of Omaha v. Carlson*, 411 N.W.2d 415, 417 (S.D.1987), CCI argues that "[f]air and reasonable value is determined by market value." We note, however, that CCI's cited authority "equated the term 'fair and reasonable value' with *'market value* [.]' " *Id.* (emphasis added) (citation omitted). That same Court then defined "market value" as "the *highest price* for which property considered at its best and most profitable use can be sold in the open market by a willing seller to a willing buyer, neither acting under compulsion and both exercising reasonable judgment." *Id.* (emphasis added). CCI then attempts to substitute in its analysis the term "market value" with the term "market rate," defined at trial as the "common mark-up over cost."

[¶ 20.] Though we might agree that a "fair and reasonable value" can be defined as "market value," we cannot agree with CCI's attempt to analogize "market value" with "market rate." This argument ig-

nores the rational conclusion that "the highest price" for which property can be sold is not necessarily the "common markup over cost." Cole's Petroleum presented evidence through expert testimony and through its dealings with other outlets that CCI's costs did not exceed the "market rate." However, even a conclusion that CCI's costs exceeded the "market rate" would not have mandated that the trial court find that the charges exceeded the "market value."

[¶ 21.] Even if CCI paid the "highest price for which [petroleum when] considered at its best and most profitable use [could] be sold in the open market by a willing seller to a willing buyer, neither acting under compulsion and both exercising reasonable judgment," its costs would still not be beyond the bounds permitted under a "fair and reasonable" analysis. *See Id.* Although CCI points to some expert testimony that concluded that the charges exceeded a "fair and reasonable" cost based on "market rate," CCI points to no expert testimony or evidence that demonstrated that the charges exceeded a "fair and reasonable" cost based on "market value." Thus, we cannot say the trial court clearly erred in finding that CCI's costs were fair and reasonable.

[¶ 22.] Affirmed.

[¶ 23.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.