#25412-a-GAS

**2010 S.D. 79**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

LLOYD STOCKWELL,                                    Plaintiff and Appellee,

    v.

CECIL STOCKWELL, JR., BRUCE
STOCKWELL, JOHN L. STOCKWELL and
ESTATE OF CECIL STOCKWELL, SR.,        Defendants and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE FIFTH JUDICIAL CIRCUIT
McCOOK COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE TIMOTHY W. BJORKMAN
Judge

\* \* \* \*

RONALD A. PARSONS, JR.
SCOTT N. HEIDEPRIEM
SHANNON R. FALON
PAMELA R. BOLLWEG of
Johnson, Heidepriem &
  Abdallah, LLP
Sioux Falls, South Dakota              Attorneys for plaintiff
                                                       and appellee.

SHAWN M. NICHOLS of
Cadwell, Sanford, Deibert
  & Garry, LLP
Sioux Falls, South Dakota              Attorneys for defendants
                                                       and appellants.

\* \* \* \*

ARGUED MAY 25, 2010

OPINION FILED **10/13/10**

#25412

SEVERSON, Justice

[¶1.] Lloyd Stockwell initiated this action to quiet title to property deeded to him by his father, Cecil Stockwell, Sr. (Cecil Sr.). Cecil Stockwell, Jr. (Cecil Jr.), Bruce Stockwell, John Stockwell, and the Estate of Cecil Sr. filed a counterclaim, alleging that Cecil Sr. lacked the testamentary capacity to execute the deed and that the deed was the product of undue influence.[1] The trial court entered a judgment quieting title and recognizing the legal validity of and enforcing Cecil Sr.'s warranty deed in favor of Lloyd. We affirm.

## BACKGROUND

[¶2.] Cecil Sr. was born on August 11, 1913, to Bernard and Ida Stockwell. Cecil Sr. lived and farmed in Minnehaha and McCook counties until his death in 2004 at the age of ninety-one. Cecil Sr. and his ex-wife, Opal, had five children: Cecil Jr., Dennis, Bruce, John, and Lloyd. Dennis was killed in the Vietnam War. Cecil Sr.'s remaining four children are the parties to this lawsuit.

[¶3.] Cecil Sr. purchased his first parcel of land at the age of twenty-eight and continued to acquire land until he was seventy-five years old. At the time of his death, Cecil Sr. owned nearly 1,000 acres of farmland in fourteen separate parcels in Minnehaha and McCook counties. It was extremely important to Cecil Sr. that his farmland remain in the Stockwell family. Throughout his life, Cecil Sr. gave his

---

1. The appellants, Cecil Stockwell, Jr., Bruce Stockwell, John Stockwell, and the Estate of Cecil Stockwell, Sr., will collectively be referred to as "the Stockwells." The appellee, Lloyd Stockwell, will be referred to as "Lloyd." Any other reference to the parties in an individual capacity will be on a first name basis.

sons land or money to buy land or allowed them to acquire his land at a reduced price. Cecil Sr. never sold a parcel of his land to anyone other than his children.

[¶4.] Cecil Sr. also farmed with each of his sons. From approximately 1972 to 1975, Cecil Sr., John, and Lloyd farmed together. Cecil Sr. experienced a difficult financial period in the mid 1970's. At that time, John and Lloyd assumed Cecil Sr.'s debt and took possession of his machinery. John and Lloyd continued to farm together until 1984. In 1985, Cecil Sr. asked Bruce, John, and Lloyd whether they would enter into a farming partnership with him. Bruce and John declined the invitation, but Lloyd accepted. Cecil Sr. and Lloyd began farming together as business partners. This partnership continued until Cecil Sr.'s death in 2004.

[¶5.] In February 1992, Cecil Sr. consulted with Dale Strasser, an attorney in Freeman, South Dakota, regarding estate planning. At that time, Cecil Sr. executed and Attorney Strasser notarized a power of attorney in favor of Lloyd. This power of attorney continued in full force and effect until Cecil Sr.'s death. Cecil Sr. also asked Attorney Strasser to prepare a deed for each of his four sons. The deeds provided that Lloyd would receive 594 acres, Bruce would receive 300 acres, John would receive 160 acres, and Cecil Jr. would receive eighty acres. Each deed reserved a life estate in favor of Cecil Sr. Cecil Sr. executed the deeds, but they were not delivered to the grantees or recorded.

[¶6.] Cecil Sr. became ill and began living with Lloyd and his wife, Lynn, in November 1997. Cecil Sr. eventually recovered from his illness and regained the strength to help around the farm. In 2001, Cecil Sr. was able to drive a vehicle, walk around the farm to check on livestock, fill water tanks, sort cattle, and assist

with other chores. Cecil Sr.'s health declined after he broke his hip in 2002, and Lloyd became increasingly responsible for Cecil Sr.'s personal needs.

[¶7.]     Cecil Sr.'s relationship with John became strained in 2000. Cecil Sr. gifted an eighty-acre parcel of farmland to John in 1979. In 2000, Lynn saw a notice in the newspaper regarding the upcoming auction of a forty-acre parcel of this land. She brought the notice to the attention of Lloyd, Cecil Sr., and Cecil Jr. John had not told any member of the family about the upcoming sale. Upon reading the notice, Cecil Sr. disappeared into his bedroom and emerged a few hours later with red, teary eyes. Cecil Sr. commented that John would receive no land from him and expressed a desire to redraft the 1992 deeds.

[¶8.]     In the summer of 2001, Cecil Sr. directed Lynn to prepare deeds in favor of Bruce, Cecil Jr., and Lloyd. Cecil Sr. provided Lynn with the 1992 deeds to use as templates. Lynn typed at least three drafts of each of the deeds. When each draft was completed, she gave it to Cecil Sr. for his review. Cecil Sr. pointed out errors, and Lynn corrected them. At this time, Cecil Sr. could recite the legal descriptions of each of his fourteen parcels of farmland from memory. While preparing the 2001 deeds, Lynn was not familiar with the legal descriptions of land, but could see that Lloyd's deed contained more legal descriptions than the deeds in favor of Bruce and Cecil Jr. Because Cecil Sr. and Lynn prepared these deeds in the evening after Lloyd had gone to bed, Lloyd was not involved in their preparation.

[¶9.]     The 2001 deeds were different than the 1992 deeds. Cecil Sr. did not prepare a deed for John in 2001. Bruce's 2001 deed included a 140-acre parcel in his 1992 deed, but not an eighty-acre parcel along the Vermillion River. Lloyd's

2001 deed included all the property in his 1992 deed, plus two additional parcels: the eighty-acre parcel in John's 1992 deed and the eighty-acre parcel along the Vermillion River in Bruce's 1992 deed. Cecil Jr.'s 2001 deed contained the same eighty-acre parcel as his 1992 deed. Like the 1992 deeds, each deed reserved a life estate in favor of Cecil Sr.

[¶10.] On the morning of September 27, 2001, Cecil Sr. asked Lloyd to take him to a notary public to sign the deeds he and Lynn prepared. That afternoon, Lloyd drove Cecil Sr. to a bank in Humboldt where Cecil Sr. previously had documents notarized. Upon learning that there was no notary public on duty, Lloyd drove Cecil Sr. to the Home Federal Bank in nearby Hartford. Maryls Bartmann, an employee of Home Federal Bank, notarized the 2001 deeds. Cecil Sr. retained possession of the deeds on the drive back to Lloyd's home. Once they arrived home, Cecil Sr. handed the three executed deeds to Lloyd, smiled, and said either, "Here you go," or "Here they are." Lloyd accepted the deeds and placed them in the top drawer of a dresser in Cecil Sr.'s bedroom. The dresser belonged to Lloyd, but he and Cecil Sr. kept titles, abstracts, and loan information in it.

[¶11.] In October 2003, Cecil Jr., Bruce, and John filed an action seeking the appointment of a conservator and guardian for Cecil Sr. They sought to place Cecil Sr. in a nursing home. This lawsuit greatly upset Cecil Sr. Lloyd hired Tom Johnson, an attorney in Sioux Falls, to defend the conservatorship and guardianship action. In December 2003, Attorney Johnson videotaped an interview with Cecil Sr. to document his competency and desire to continue living with Lloyd and Lynn. During the interview, Cecil Sr. was able to identify his four children,

their occupations, and generally where they resided.  He stated that he liked living with Lloyd and Lynn and that he did not want to change his living arrangement.  He confirmed that Lloyd had never threatened or harmed him.

[¶12.]	But Cecil Sr. made several misstatements during the course of the interview.  When asked how much land he owned, Cecil Sr. incorrectly stated that he owned 300 acres.  He, in fact, owned nearly 1,000 acres at the time.  He was not asked to identify the parcels he owned or how many quarter-sections they comprised.  He indicated that he remembered signing the 2001 deeds and that Lloyd was to receive a majority of his property because it was the "fairest way to do it," but could not say why.  Cecil Sr. also struggled to name one of his grandchildren and appeared unaware that Opal, his ex-wife, had remarried.

[¶13.]	On July 7, 2004, Lloyd informed Cecil Sr. that he would have to move to a nursing home.  Cecil Sr. told Lloyd that he should record the 2001 deeds and directed him to retrieve the deeds from the dresser in his bedroom.  Realizing that he likely would never see his land and livestock again, Cecil Sr. asked Lloyd to drive him around the farm one last time.  Lloyd drove Cecil Sr. around the property before taking him to the Good Samaritan Home in Canistota.  Shortly thereafter, Lloyd took the 2001 deeds to Attorney Johnson to be recorded.  Cecil Sr. passed away four months later on November 19, 2004.

[¶14.]	On January 12, 2005, Lloyd initiated this action against the Stockwells to quiet title to the property deeded to him by Cecil Sr.  The Stockwells filed a counterclaim on March 8, 2005, alleging lack of testamentary capacity and undue influence.  The case proceeded to trial on April 21 and 22, 2009.  On June 23, 2009,

the trial court entered findings of fact and conclusions of law, finding that Lloyd's 2001 deed was validly delivered on September 27, 2001, and that Cecil Sr. was competent when the deed was prepared, executed, delivered, and recorded. The trial court further found that the 2001 deeds were not the product of undue influence. As a result, the trial court concluded that Lloyd is the sole and exclusive owner of the property described in his 2001 deed.

## STANDARD OF REVIEW

[¶15.]     We have said that testamentary capacity and undue influence are questions of fact reviewed under the clearly erroneous standard. *See In re Estate of Pringle*, 2008 S.D. 38, ¶ 18, 751 N.W.2d 277, 284 (quoting *In re Estate of Dokken*, 2000 S.D. 9, ¶ 10, 604 N.W.2d 487, 490-91). But to clarify, testamentary capacity and undue influence are mixed questions of law and fact and require a compound inquiry. *See In re Dorsey & Whitney Trust Co., L.L.C.*, 2001 S.D. 35, ¶ 6, 623 N.W.2d 468, 471 (A mixed question of law and fact is one in which "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the rule of law as applied to the established facts is or is not favorably satisfied.") (quoting *Permann v. S.D. Dep't of Labor*, 411 N.W.2d 113, 118 (S.D. 1987) (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19, 102 S.Ct. 1781, 1790 n.19, 72 L.Ed.2d 66, 80 n.19 (1982))). We are asked to review not only the trial court's findings of historical fact concerning testamentary capacity and undue influence, but also the trial court's application of those established legal standards to the facts.

[¶16.] We separately determine the standard of review for these two inquiries. As to the first inquiry, the trial court's findings of fact will not be set aside unless they are clearly erroneous. *See* SDCL 15-6-52(a). The question is not whether this Court would have made the same findings the trial court did, but whether on the entire evidence, "we are left with [a] definite and firm conviction that a mistake has been made." *Pringle*, 2008 S.D. 38, ¶ 18, 751 N.W.2d at 284 (quoting *Dokken*, 2000 S.D. 9, ¶ 10, 604 N.W.2d at 490-91). But in deciding a mixed question of law and fact, the standard of review for the second inquiry – the application of law to fact – depends on the nature of the inquiry:

> If application of the rule of law to the facts requires an inquiry that is 'essentially factual' – one that is founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct' – the concerns of judicial administration will favor the [trial] court, and the [trial] court's determination should be classified as one of fact reviewable under the clearly erroneous standard. If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo.[2]

---

2.  *Permann*, 411 N.W.2d 113, which adopted the reasoning of *United States v. McConney*, 728 F.2d 1195 (9th Cir. 1984) (en banc), *overruled on other grounds by Estate of Merchant v. C.I.R.*, 947 F.2d 1390 (9th Cir. 1991), is at times erroneously cited for the proposition that all mixed questions of law and fact are reviewed de novo with no deference to the fact-finding court. In *McConney*, the Ninth Circuit thoroughly examined issues regarding the standard of review for mixed questions of law and fact. 728 F.2d 1195. That frequently cited case does more than merely assign a de novo standard of review to mixed questions of law and fact. Rather, the standard of review depends on which court, the trial court or the appellate court, is in the best position to address the particular critical issue in the case. *Id.* at 1202. *See also* Warner, Randall H., *All Mixed Up About Mixed Questions*, 7 J. App. Prac. & Process 101 (2005) (analyzing issues courts face in determining the appropriate standard of review for mixed questions of law and fact).

*Darling v. West River Masonry, Inc.*, 2010 S.D. 4, ¶ 10, 777 N.W.2d 363, 366 (quoting *McNeil v. Superior Siding, Inc.*, 2009 S.D. 68, ¶ 6, 771 N.W.2d 345, 347-48 (quoting *Permann*, 411 N.W.2d at 119 (quoting *McConney*, 728 F.2d at 1202))). In reviewing the application of the established legal standards of testamentary capacity and undue influence to the facts, the concerns of judicial administration favor the trial court. After all, testamentary capacity and undue influence are non-technical, fact-based inquiries that require a trial court to examine the parties' motives and states of mind. *See Pullman-Standard*, 456 U.S. at 289, 102 S.Ct. at 1790 (concluding that the mixed question whether the facts demonstrated the intent to discriminate is a non-technical, fact-based inquiry reviewed under the clearly erroneous standard); *see also Oregon v. Kennedy*, 456 U.S. 667, 677 n.7, 102 S.Ct. 2083, 2090 n.7, 72 L.Ed.2d 416 (1982); *Commissioner v. Duberstein*, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960). This Court thus reviews the trial court's findings of fact on the mixed questions of testamentary capacity and undue influence as well as the application of those established legal standards to the facts under the clearly erroneous standard.

[¶17.] The Stockwells, relying on *First Nat'l Bank of Biwabik, Minn. v. Bank of Lemmon*, 535 N.W.2d 866, 871 (S.D. 1995), argue that the facts of this case are not settled. They urge this Court to review certain documentary evidence in this case relating to testamentary capacity and undue influence de novo. This argument is misplaced.

> This Court formerly reviewed documentary evidence and deposition testimony under the de novo standard. However, SDCL 15-6-52(a), [as amended in 2000], specifically provides

that "findings of fact, whether based on oral or documentary evidence, may not be set aside unless clearly erroneous."

*Gluscic v. Avera St. Luke's*, 2002 S.D. 93, ¶ 15, 649 N.W.2d 916, 919 (quoting *Faulk v. Faulk*, 2002 S.D. 51, ¶ 9, 644 N.W.2d 632, 634 (quoting *In re Estate of Catron*, 2001 S.D. 57, ¶ 11, 627 N.W.2d 175, 177)) (additional citations omitted). *See* 2000 S.D. Sess. Laws ch. 91, § 1. *See also Melstad v. Kovac*, 2006 S.D. 92, ¶ 6, n.2, 723 N.W.2d 699, 702 n.2; *Convenience Ctr., Inc. v. Cole*, 2004 S.D. 42, ¶ 11, 678 N.W.2d 774, 777.

## ANALYSIS AND DECISION

[¶18.]    **1.    Whether the trial court's conclusion on the mixed question of law and fact that Lloyd's deed was delivered in 2001 is clearly erroneous.**

[¶19.]    "A gift is a transfer of [ ] property, made voluntarily and without consideration." SDCL 43-36-1. In South Dakota, a gift is complete when three elements are satisfied: (1) intent; (2) delivery; and, (3) acceptance. *Estate of Juhnke* ex rel. *Juhnke v. Marquardt*, 2001 S.D. 26, ¶ 11, 623 N.W.2d 731, 734 (citing *Meyer v. S.D. Dep't of Soc. Servs.*, 1998 S.D. 62, ¶ 12, 581 N.W.2d 151, 155).

[¶20.]    "A deed, to become effective, must be delivered by the grantor during his lifetime." *Spitzer v. Spitzer*, 84 S.D. 147, 151, 168 N.W.2d 718, 720 (1969). *See* SDCL 43-4-7. "The delivery of a deed must be unconditional in nature and no delivery can be accomplished without the grantor relinquishing possession of the deed as well as all power and control over it." *Nelson v. Nelson*, 293 N.W.2d 463, 466 (S.D. 1980) (citing *Hagen v. Palmer*, 87 S.D. 485, 210 N.W.2d 164 (1973); *Benson v. Benson*, 63 S.D. 241, 257 N.W. 460 (1934); *Cassidy v. Holland*, 27 S.D. 287, 130 N.W. 771 (1911)). "[T]here exists a presumption of valid delivery where

the deed was duly executed, acknowledged, and in possession of the grantee[.]" *Id.* (citing *Huber v. Backus*, 79 S.D. 342, 112 N.W.2d 238 (1961); *Lewis v. Tinsley*, 66 S.D. 648, 287 N.W. 507 (1939); *Wolf v. Wolf*, 59 S.D. 418, 240 N.W. 349 (1932)). *See* SDCL 43-4-7. Moreover, when possession of the deed by the grantee is established, it is presumed that the grantor placed the deed in the grantee's possession with the intent to convey title. *Lewis*, 287 N.W. at 508. This Court reviews the trial court's findings of fact on the mixed question of delivery and the application of law to those facts under the clearly erroneous standard. *See supra* ¶¶ 15-16.

[¶21.] The burden of overcoming these presumptions is on the party claiming the deed was not delivered. "A presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast." *In re Estate of Gustafson*, 2007 S.D. 46, ¶ 11, 731 N.W.2d 922, 926 (quoting *In re Estate of Duebendorfer*, 2006 S.D. 79, ¶ 45, 721 N.W.2d 438, 450) (quoting SDCL 19-11-1)). "When substantial, credible evidence has been introduced to rebut the presumption, it shall disappear from the action or proceeding[.]" SDCL 19-11-1. "[M]ere assertions, implausible contentions, and frivolous avowals will not avail to defeat a presumption." *In re Estate of Dimond*, 2008 S.D. 131, ¶ 9, 759 N.W.2d 534, 538.

[¶22.] The Stockwells argue that Lloyd's deed was not delivered until it was recorded in 2004.[3] The Stockwells maintain that the 2001 delivery was conditional and therefore invalid because Cecil Sr. directed Lloyd not to record the deed at that time. *See Nelson*, 293 N.W.2d at 466 (citations omitted). In other words, Cecil Sr. did not relinquish "possession of the deed as well as all power and control over it."[4] *See id.* Yet the deed was duly executed, acknowledged, and in the possession of Lloyd, the grantee, and there exists a presumption of valid delivery. *See id.* Moreover, we must presume that Cecil Sr. placed the deed in Lloyd's possession with the intent to convey title. *See Lewis*, 287 N.W. at 508. The Stockwells presented no evidence to contradict Lloyd's testimony regarding the manner in which he came into possession of his deed. The Stockwells therefore did not rebut the presumption that Lloyd's deed was validly delivered with the intent to convey title on September 27, 2001, the day it was executed. Applying the undisputed facts on the mixed question of delivery, the trial court's conclusion that Lloyd's deed was delivered in 2001 is not clearly erroneous.

---

3. Because the issue has not been presented to this Court, we express no opinion as to whether the 2001 deeds were delivered to Bruce, John, or Cecil Jr. during Cecil Sr.'s lifetime.

4. The Stockwells appear to argue that the deeds were not delivered in September 2001 because Lloyd placed them in a dresser in Cecil Sr.'s bedroom. But the dresser belonged to Lloyd, and he kept legal documents in it. Moreover, under South Dakota law, "[r]edelivering a grant of real property to the grantor or canceling it does not operate to retransfer the title." SDCL 43-4-12. *See Birchard v. Simons*, 59 S.D. 422, 240 N.W. 490, 492 (1932) (holding that completed delivery of a deed was not subsequently invalidated by return of deed to grantor for recording, safe-keeping, or other special purpose).

[¶23.]    Nevertheless, the Stockwells contend that Lloyd is bound by interrogatory answers he submitted in May 2007, indicating that Cecil Sr. "delivered" Lloyd's deed on July 7, 2004, when he instructed Lloyd to retrieve it from the dresser and record it. Lloyd later amended his interrogatory answer to provide that his deed was "delivered" on September 27, 2001. The Stockwells assert that a finder of fact is empowered to reject all of a witness's testimony if it concludes that he has testified falsely. Given Lloyd's prior inconsistent statement regarding delivery, the Stockwells argue that the trial court should have rejected Lloyd's testimony and concluded that his deed was delivered in July 2004.

[¶24.]    It is true that the interrogatory answers Lloyd submitted in May 2007 indicate that his deed was "delivered" in July 2004. But Lloyd is not an attorney and testified that he did not understand "delivery" in the legal sense when he initially answered the interrogatory. The undisputed facts establish the manner in which Lloyd came into possession of his 2001 deed, and the trial court found Lloyd's explanation for the error in the interrogatories acceptable. While a finder of fact may reject a witness's testimony when that witness has testified falsely, it is not required to do so. "The credibility of the witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the [trial] court, and we give due regard to the [trial] court's opportunity to observe the witnesses and the evidence." *Pringle*, 2008 S.D. 38, ¶ 18, 751 N.W.2d at 284 (quoting *Dokken*, 2000 S.D. 9, ¶ 10, 604 N.W.2d at 490-91). The trial court's acceptance of Lloyd's testimony and conclusion that delivery of his deed occurred on September 27, 2001, are not clearly erroneous.

**[¶25.]** **2. Whether the trial court's conclusion on the mixed question of law and fact that Cecil Sr. had capacity to execute and deliver Lloyd's deed is clearly erroneous.**

**[¶26.]** The Stockwells argue that the trial court's conclusion on the mixed question that Cecil Sr. had capacity to execute and deliver Lloyd's deed is clearly erroneous. This Court has said that deeds are testamentary in nature when the record indicates that they were executed "with a mind toward disposition of the real property following [the testator's] death." *Id.* ¶ 24, 751 N.W.2d at 285. Because Cecil Sr. executed the deeds to his sons in lieu of a will and intended those deeds to govern the disposition of his real property at or near the end of his life, we apply this Court's well settled standard for testamentary capacity to the facts of this case. *See id.*

**[¶27.]** SDCL 29A-2-501 requires that a testator be of sound mind. "Testamentary capacity and competence evincing the soundness of mind required to make a will are demonstrated when, without prompting, one is able to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty, and the disposition that he desires to make of [his] property." *Pringle*, 2008 S.D. 38, ¶ 20, 751 N.W.2d at 284 (citing *In re Estate of Linnell*, 388 N.W.2d 881, 883 (S.D. 1986) (quoting *In re Podgursky's Estate*, 271 N.W.2d 52, 55 (S.D. 1978))). "Testamentary capacity and competence [ ] does not require that one have the intellectual vigor of youth or perfect health." *Id.* (citations omitted). "Moreover, it is not necessary that a person desiring to make a will have the capacity to make contracts and do business." *Id.* (citations omitted). "One may lack competency, such that in the view of medical science he is not of sound mind and memory, yet

- 13 -

still retain the requisite competency to execute a will." *Id.* (citations omitted).

"Testamentary capacity is not determined by any single moment in time, but must be considered as to the condition of the testator's mind a reasonable length of time before and after the will is executed." *Id.* (citations omitted).

[¶28.]     The Stockwells argue that Lloyd's deed was delivered in 2004 and therefore focus on Cecil Sr.'s testamentary capacity as of that date. In challenging Cecil Sr.'s testamentary capacity at trial, the Stockwells primarily relied on Attorney Johnson's December 2003 videotaped interview with Cecil Sr. and nursing home records dated after execution and delivery of Lloyd's 2001 deed. The trial court ultimately concluded that Cecil Sr. was competent to execute and deliver Lloyd's deed with the intent to convey title in both September 2001 and July 2004.

[¶29.]     We decline the Stockwells' invitation to review the December 2003 videotaped interview and the nursing home records de novo to determine Cecil Sr.'s testamentary capacity in 2004. *See supra* ¶ 17. The trial court did not err by concluding that Lloyd's deed was executed and delivered in September 2001, and we need only consider the trial court's findings regarding Cecil Sr.'s testamentary capacity at that time. The December 2003 videotaped interview and nursing home records were prepared well after the execution and delivery of Lloyd's 2001 deed and are therefore largely irrelevant. Lloyd, Lynn, and others testified that in 2001 Cecil Sr. readily knew and recognized members of his family, stated often that he owned nearly 1,000 acres of land, and was able to recite the legal descriptions of his land from memory, recall the names the family had given each of his fourteen parcels, and assist with chores around the farm. Having reviewed the record, we

cannot conclude that the trial court's conclusion on the mixed question that Cecil Sr. had testamentary capacity to execute and deliver Lloyd's deed in September 2001 is clearly erroneous.

[¶30.]      **3.**      **Whether the trial court's conclusion on the mixed question of law and fact that the 2001 deeds were not the product of undue influence is clearly erroneous.**

[¶31.]      The Stockwells argue that the trial court's conclusion on the mixed question that the 2001 deeds were not the product of undue influence is clearly erroneous. "A presumption of undue influence arises 'when there is a confidential relationship between the testator and a beneficiary who actively participates in preparation and execution of the will and unduly profits therefrom.'" *Pringle*, 2008 S.D. 38, ¶ 39, 751 N.W.2d at 289 (citing *Dokken*, 2000 S.D. 9, ¶ 28, 604 N.W.2d at 495). "A 'confidential relationship exists whenever a decedent has placed trust and confidence in the integrity and fidelity of another.'" *Duebendorfer*, 2006 S.D. 79, ¶ 27, 721 N.W.2d at 445 (quoting *In re Estate of Unke*, 1998 S.D. 94, ¶ 16, 583 N.W.2d 145, 148 (citing *In re Estate of Madsen*, 535 N.W.2d 888, 892 (S.D. 1995))). "When this presumption arises, the burden shifts to the beneficiary to show he took no unfair advantage of the decedent. However, the ultimate burden remains on the contestant to prove the elements of undue influence by a preponderance of the evidence." *Pringle*, 2008 S.D. 38, ¶ 39, 751 N.W.2d at 289 (citing *Dokken*, 2000 S.D. 9, ¶ 28, 604 N.W.2d at 495) (emphasis omitted).

[¶32.]      Lloyd was close to Cecil Sr. in the final years of his life. Lloyd was engaged in a farming partnership with Cecil Sr., held a power of attorney, and was responsible for Cecil Sr.'s increasing personal needs. While Lloyd was not involved

in the preparation of the 2001 deeds, he drove his father to Humboldt and Hartford to execute and notarize the deeds. Thus, the trial court's conclusion that "there was sufficient evidence that a confidential relationship existed between Lloyd and Cecil Sr. such that Lloyd shoulder[ed] the burden of coming forward with evidence to rebut the presumption" of undue influence is not clearly erroneous.

[¶33.] Lloyd produced substantial, credible evidence to rebut the presumption of undue influence. *See* SDCL 19-11-1. Lloyd did receive more property under the 2001 deeds than his brothers. Yet even under the 1992 deeds, which were prepared at a time when there has been no suggestion of undue influence, Lloyd was to receive the bulk of Cecil Sr.'s property. Furthermore, evidence was presented that Cecil Sr. chose to give Lloyd more property under the 2001 deeds than the 1992 deeds for several reasons: (1) John sold family land in 2000 without informing any member of the family; (2) Bruce and Cecil Sr. had a falling out in 1996 over a family combining business; (3) Lloyd's son is the only grandchild who intends to continue the family farming tradition; and, (4) Lloyd's children expressed a desire to build homes and live on the eighty-acre parcel along the Vermillion River. The trial court found that Cecil Sr. chose to leave the eighty-acre parcel in John's 1992 deed and the eighty-acre parcel along the Vermillion River in Bruce's 1992 deed to Lloyd for these reasons.

[¶34.] Cecil Sr.'s generosity to his sons throughout his life also affected the final distribution of his property. In 1965, Cecil Sr. gifted Cecil Jr. $5,500 to help

him buy farmland near Humboldt.[5] In 1972, Cecil Sr. gifted Lloyd $9,400 to buy a parcel of farmland. Cecil Sr. was also generous to Bruce and John. In 1975, Cecil Sr. gifted Bruce a twenty-acre parcel of land. Cecil Sr. gave John $3,400 for a down payment on a house in Sioux Falls in 1976, gifted him an eighty-acre parcel in 1979, and helped him buy a sixty-acre parcel of land in 1987. Additionally, in 1995, Cecil Sr. sold a 160-acre parcel of land to Bruce and John at approximately one-half its fair market value, equating a gift to each of approximately $40,000. Having established that Lloyd rebutted the presumption of undue influence, it remains for the Stockwells to prove it occurred.

[¶35.]     "It is well settled that it is the burden of the contestant of a testamentary document to prove each of the four elements of undue influence by the greater weight of the evidence." *Pringle*, 2008 S.D. 38, ¶ 44, 751 N.W.2d at 291 (quoting *In re Estate of Schnell*, 2004 S.D. 80, ¶ 21, 683 N.W.2d 415, 421 (citing *In re Estate of Holan*, 2001 S.D. 6, ¶ 16, 621 N.W.2d 588, 591-92)). "These elements include: (1) decedent's susceptibility to undue influence; (2) opportunity to exert such influence and effect the wrongful purpose; (3) a disposition to do so for an improper purpose; and, (4) a result clearly showing the effects of undue influence." *Id.* (citations omitted). "For influence to be undue it must be of such a character as to destroy the free agency of the testator and substitute the will of another for that

---

5.     Cecil Jr. later refinanced and borrowed $140,000 against this land. He was not able to make the payments on that loan, and the bank foreclosed on the land in the early 1980's. This foreclosure, accompanied by Cecil Sr.'s decision in 1980 to allow John and Lloyd to farm land previously farmed by Cecil Jr., caused a serious divide between Cecil Jr. and his parents.

of the testator." *Id.* (quoting *Schnell*, 2004 S.D. 80, ¶ 21, 683 N.W.2d at 421 (quoting *In re Estate of Elliot*, 537 N.W.2d 660, 662 (S.D. 1995))). We review a trial court's factual findings concerning undue influence and the application of law to those facts under the clearly erroneous standard. *Id.* ¶ 18, 751 N.W.2d at 284. *See supra* ¶¶ 15-16.

[¶36.] We must first examine Cecil Sr.'s susceptibility to undue influence and Lloyd's opportunity and disposition to exert such influence. The trial court found that "Cecil Sr. was a strong-willed man; he could be stubborn, and generally did as he saw fit. He was not the type of man who was easily influenced by others." Indeed, Attorney Strasser observed that Cecil Sr. "did not appear to be under Lloyd's control at the time that he did work for Cecil Sr.," found Cecil Sr. to be independent, and "did not believe him to be unduly influenced by Lloyd." The trial court did not err by finding that Lloyd was not disposed to exert influence over Cecil Sr. and that if Lloyd did have the opportunity to exert influence over Cecil Sr. given the nature of their relationship, there was no evidence that he did so to effect a wrongful purpose.

[¶37.] We must also examine whether the final distribution of Cecil Sr.'s property as set forth in the 2001 deeds is a result demonstrating the effects of undue influence. Cecil Sr.'s relationship with each of his four sons and his generosity to them throughout his life explains the distribution of his property. *See supra* ¶¶ 33-34. Additionally, it appears that Cecil Sr. took into consideration the role each son played in the acquisition and maintenance of each of his fourteen parcels of farmland. Much of the land Cecil Sr. deeded to Lloyd was purchased with

the proceeds of Cecil Sr. and Lloyd's farming partnership. Cecil Sr. also attempted to deed land to sons who owned adjoining land or had previously farmed or rented that which he was to receive. For these reasons, we cannot conclude that the trial court's conclusion on the mixed question that the 2001 deed was not the product of undue influence is clearly erroneous.

[¶38.]     **4.     Whether the trial court abused its discretion by excluding Exhibit 81, which contains a settlement discussion recorded without Lloyd's knowledge.**

[¶39.]     The Stockwells argue that the trial court abused its discretion by excluding Exhibit 81, which contains a settlement discussion recorded without Lloyd's knowledge. Exhibit 81 begins with Lloyd discussing the distribution of Cecil Sr.'s property and various assets and assuring Bruce that the distribution conforms with Cecil Sr.'s wishes. Lloyd informs Bruce that John is not to receive any land and explains why. The discussion continues with Bruce repeatedly assuring Lloyd that his brothers, John and Cecil Jr., will not accept Lloyd's proposed distribution of Cecil Sr.'s assets. Bruce and Lloyd also discuss the distribution of Cecil Sr.'s cattle as well as the payment of estate taxes, real property taxes, and Cecil Sr.'s debts, including the mortgages on the deeded properties.

[¶40.]     The Stockwells first argue that Exhibit 81 is admissible under SDCL 19-16-34, which provides:

> In actions, suits, or proceedings by or against the representatives of deceased persons including proceedings for the probate of wills, any statement of the deceased whether oral or written shall not be excluded as hearsay, provided that the trial judge shall first find as a fact that the statement was made by decedent, and that it was in good faith and on decedent's personal knowledge.

Exhibit 81 contains no statements by Cecil Sr., the decedent. It is a discussion between Bruce and Lloyd. Therefore, while "[t]his Court liberally construes [SDCL 19-16-34] so as to achieve its intended purpose[,]" we cannot conclude that Exhibit 81 is admissible under this statute. *Olson-Roti v. Kilcoin*, 2002 S.D. 131, ¶ 23, 653 N.W.2d 254, 259 (citing *In re Estate of Regennitter*, 1999 S.D. 26, ¶ 14, 589 N.W.2d 920, 924).

[¶41.] The Stockwells also rely on *In re Estate of Melcher*, 89 S.D. 253, 232 N.W.2d 442 (1975), and *In re Estate of Blake*, 81 S.D. 391, 136 N.W.2d 242 (1965), to argue for the admissibility of Exhibit 81. In *Melcher*, this Court stated, "[A]ny evidence which shows susceptibility, opportunity, disposition to use, or a result indicative of undue influence is admissible." 89 S.D. at 262, 232 N.W.2d at 447 (quoting *Blake*, 81 S.D. at 398, 136 N.W.2d at 246-47). Exhibit 81 contains several statements by Lloyd: "I done just what my father told me to do clear to the end"; "But it ain't my doing. It's just the way Dad had it"; and, "I guaranteed him I would take care of him. He held that over my head." Having reviewed Exhibit 81 in its entirety, we cannot see that its contents demonstrate "susceptibility, opportunity, disposition to use, or a result indicative of undue influence."[6] *Id.*

[¶42.] Furthermore, *Melcher* and *Blake* do not stand for the proposition that the traditional rules of evidence fail to apply in actions involving allegations of

---

6. An error in admitting evidence must be prejudicial before this Court will overturn the trial court's evidentiary ruling. SDCL 15-6-61. Because the discussion on Exhibit 81 largely corroborates the testimony and evidence presented at trial, its exclusion did not prejudice the Stockwells' "substantial rights." *See id.*

undue influence. SDCL 19-12-10 governs the admissibility of offers of compromise and settlement negotiations:

> Evidence of:
> (1) Furnishing or offering or promising to furnish; or
> (2) Accepting or offering or promising to accept,
> a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This section does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This section also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay or proving an effort to obstruct a criminal investigation or prosecution.

Exhibit 81 begins with Lloyd stating, "Okay. I'm going to start out with the end first. We've come to an agreement. This is what she is[.]" Bruce and Lloyd thereafter discuss Lloyd's proposed distribution of Cecil Sr.'s property, assets, and debts, and Bruce assures Lloyd that John will not accept his proposal. Whether Exhibit 81 contains a settlement discussion is admittedly a close question, but "[e]videntiary rulings made by the trial court are presumed correct and are reviewed under an abuse of discretion standard." *Olson-Roti*, 2002 S.D. 131, ¶ 19, 653 N.W.2d at 258 (citations omitted). We conclude that the trial court did not abuse its discretion by excluding Exhibit 81 pursuant to SDCL 19-12-10.

[¶43.]     Affirmed.

[¶44.]     GILBERTSON, Chief Justice, KONENKAMP and ZINTER, Justices, concur.

[¶45.]     MEIERHENRY, Justice, deeming herself disqualified, did not participate.